[Cite as *State v. Croom*, 2013-Ohio-3377.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY   COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 25094 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2010-CR-2215 |
| v. | : | |
| | : | |
| ANTHONY L. CROOM | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of August, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by CARLEY J. INGRAM, Atty. Reg. #0020084, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

MARSHALL G. LACHMAN, Atty. Reg. #0076791, 75 North Pioneer Boulevard, Springboro, Ohio 45066
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FAIN, P.J.,

{¶ 1}    Anthony Croom appeals from his conviction and sentence for Aggravated Murder, two counts of Murder, and two counts of Felonious Assault.  Croom advances ten assignments of error on appeal. Croom contends the trial court erred in overruling his motion to suppress a photographic identification as unreliable, and that the trial court erred in

overruling his motion to suppress statements made during the course of plea negotiations. Croom next challenges the legal sufficiency and manifest weight of the evidence to support his convictions. Croom complains that he was denied the effective assistance of counsel. Croom also contends that the trial court erred by permitting hearsay testimony in regard to a conspiracy to commit murder. He further claims that the prosecutor acted improperly during closing arguments. Croom raises an argument of cumulative error. Finally, Croom argues that the trial court erred with regard to an order requiring him to make restitution to the family of the victim, and with regard to an order to repay the expenses of extradition.

{¶ 2}    We conclude that the trial court did not err in denying Croom's motion to suppress either the identification or statements made to law enforcement personnel. The photographic array was not suggestive, and the record does not support a finding that the identification was unreliable. The statement made to police was not made with a reasonable belief that plea negotiations were ongoing. We also conclude that the record contains evidence upon which the jury could rely in convicting Croom of the charged offenses. We further find no support for Croom's claims that trial counsel was ineffective and that the prosecutor made improper comments during closing argument. We conclude that the trial court did not err in permitting testimony regarding statements made by the persons involved in the conspiracy to commit murder, because independent evidence of the conspiracy was admitted during trial. We conclude that the trial court did err in ordering Croom to make restitution and to pay the expenses of extradition. Because we only find error with regard to the payment of restitution and extradition expenses, we conclude that the claim of cumulative error lacks merit.

{¶ 3}    Accordingly, that part of the judgment of the trial court ordering Croom to pay

restitution and the expenses of his extradition is Reversed; the judgment of the trial court is Affirmed in all other respects, and this cause is remanded for consideration of Croom's ability to pay restitution.

## I.  A Clerk's Mistake Leads to Murder

**{¶ 4}**   This case involves the murder of Anthony Hurd, who was a cooperating informant for the United States Drug Enforcement Agency (DEA).  In 2006, Hurd aided the DEA in making a controlled drug purchase.  Thereafter, three individuals, Rollie Mitchell, Billy Hicks and Tyree Smith, were charged in Wayne County, Indiana, with distribution of crack cocaine.  Due to a clerical mistake, the court clerk failed to file the case under seal, and Hurd's involvement became known to one of the three charged individuals.  Hurd began receiving death threats.  On August 2, 2007, at approximately 2:20 a.m., Anthony Hurd and Tiffany Brewer were together in a vehicle at an Englewood gas station when they were shot.  Hurd died as a result of his injuries.

**{¶ 5}**   During trial, the State produced evidence that Rollie Mitchell and Billy Hicks recruited Croom, whose cousin "Q" [Quentin Cheshier] was an acquaintance of Mitchell's, to kill Hurd in exchange for a red Cadillac and cash.  The State presented an eyewitness who identified Croom as the individual who shot Hurd.  The State further presented the testimony of two men who were in prison with Croom, both of whom testified that Croom admitted to committing the offense.

## II.  The Course of Proceedings

{¶ 6}     Following an investigation, Croom was charged with one count of Aggravated Murder in violation of R.C. 2903.01(A), one count of Murder in violation of R.C. 2903.02(A), one count of Murder in violation of R.C. 2903.01(B), one count of Felonious Assault in violation of R.C. 2903.11(A)(1), and one count of Felonious Assault in violation of R.C. 2903.11(A)(2). Each count carried a firearm specification.

{¶ 7}     Croom was convicted on all counts and firearm specifications. The trial court merged all the firearm specifications into a single specification. The trial court also merged all the counts with the Aggravated Murder count, and sentenced Croom to life imprisonment with no possibility of parole. The trial court sentenced Croom to three years on the firearm specification, to run consecutively to the life sentence. From his conviction and sentence, Croom appeals.

### III.   Lindsay Hoover's Identification of Croom's Photograph Was Not Made as a Result of an Unduly Suggestive Procedure

{¶ 8}     Croom's First Assignment of Error is as follows:

THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S MOTION TO SUPPRESS AN OUT-OF-COURT IDENTIFICATION OF THE APPELLANT.

{¶ 9}     Croom contends that the trial court should have suppressed the identification testimony of Lindsay Hoover, who was an eyewitness to the shooting. In support, he argues that her identification of him from a photographic array was not reliable, because: 1) it was made three years after the crime was committed; 2) the photograph of Croom shows him with his eyes

wider than any of the other individuals in the array; 3) Croom's photograph has a blue background not found in any of the other photographs; 4) Croom's photograph is "noticeably larger" than the others; 5) Hoover took 30 to 45 seconds to make the identification as being photograph number one or three (Croom's picture was in the number three position), and did not make a positive identification until the officer questioning her created a "paper hat" to place on the head of each individual; and 5) Hoover's testimony regarding the offense demonstrated that her identification was suspect.

{¶ 10}    Due process requires suppression of an identification, whether made in or out of court, if the confrontation procedure was "unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances." (Citation omitted.)  *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶ 19.   "In the context of eyewitness identification testimony, an impermissibly suggestive identification procedure will be suppressed due to the substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Marbury,* 10th Dist. Franklin No. 03AP-233, 2004-Ohio-3373, ¶ 56.

{¶ 11}    Admissibility hinges upon the reliability of the identification and is determined from the totality of the circumstances, "which includes the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated, and the time between the crime and the identification procedure."   (Citations omitted.)  *State v. Robinson*, 2d Dist. Montgomery No. 17393, 2001 WL 62569, *6 (Jan. 26, 2001).

{¶ 12}    At the suppression hearing, Englewood Detective Alan Meade testified that he

created the photographic array using the Ohio Bureau of Motor Vehicles drivers licensing database as well as the OLEG system maintained by the Ohio Attorney General's office. Meade testified that he used the system to "generate a photo spread using people that are like and similar in age, height and weight to Mr. Croom. And that system randomly pulls photos up of individuals that have likeness and similarities. And then I printed out those photos." Because Croom did not have a photo license in Ohio, Meade obtained a photograph from the Indiana Bureau of Motor Vehicles, which he then added to the array. Meade placed Croom's picture in the third position out of six pictures.

{¶ 13} Meade then arranged to meet with eyewitness Lindsay Hoover in order to show her the photographic array. Hoover lived in Columbus, so Meade met her in Columbus in a church parking lot. Hoover was alone when she met with Meade. Meade read the following instructions to Hoover prior to showing her the array:

> I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hair styles, beards and moustaches may be easily changed. Also, photographs may not always depict the true complexion of a person: it may be lighter or darker than shown in the photo. Pay no attention to any markings or numbers that may appear on the photos or any other differences in the type or style of the photographs. When you have looked at all the photos, tell me whether or not you see the person who committed the crime. Do not tell other witnesses that you have or have not identified anyone.

{¶ 14} Within approximately thirty seconds, Hoover stated that the shooter was either

the individual in photograph number one or number three. She informed Meade that the shooter had been wearing a baseball cap at the time of the offense, and that she "knew it was either one or three and that she wanted to make sure that she picked the right person." Meade then took a plain sheet of paper and placed it across the tops of the heads of the three individuals pictured in the top row of the array (photographs number one, two and three). Within "ten to twenty" seconds, Hoover identified photograph number three as the shooter, stating that she would "never forget what his eyes looked like." Hoover and Meade both signed the instruction page on the back of the array.

{¶ 15}   Croom contends that the array was unduly suggestive. After examining the array, we reject Croom's contentions that his photograph is larger than the other photographs in the array and that his eyes appear wider than the eyes of the individuals in the five other photographs. Croom also argues that his photograph has a blue background not found in the other pictures. We conclude that this does not render the array unduly suggestive – all of the photographs have backgrounds varying in shades of blue to lavender. Although Croom complains that Meade manipulated the photos in the array by placing a piece of paper over them, the record reveals that he did so uniformly with respect to the top three photographs that included the two remaining after Hoover had eliminated the other four as possibilities. And Meade's purpose was to simulate the effect of the baseball cap that Hoover said the perpetrator was wearing. There is nothing in the record to suggest that this was done in a suggestive manner. We find nothing suggestive about the array, and we do not find Meade's placement of the paper across the top three photographs to have been unduly suggestive.

{¶ 16}   Croom also contends that Hoover's identification of him was stale, having

occurred three years after the offense. We agree that in this context, three years is a long time, but Hoover was able to identify Croom as the shooter in about a minute. Furthermore, Hoover was able to observe Croom during the shooting, and as he crossed in front of the vehicle in which she was seated, Hoover and Croom stared at each other. Hoover had an unobstructed view of the crime and of Croom, and due to the shocking nature of the crime, she was able to recall the details of the shooting. We conclude that the trial court did not err in finding that the lapse of time did not render Hoover's identification so unreliable as to violate due process and warrant suppression under *Neil v. Biggers, supra*.

{¶ 17} Croom contends that Hoover's trial testimony regarding her identification and her observation of the offense demonstrate that her identification was unreliable. Specifically, Croom cites the fact that Hoover testified that the victim got into the driver's side of his vehicle; that the shooter was wearing a red baseball cap; that shots were fired from both the driver's side and the passenger's side of the vehicle; and that the shooter walked right in front of Hoover's vehicle, where she was able to look him in the eye. Croom argues that the video of the shooting and "other testimony elicited at trial" refute all of Hoover's testimony.

{¶ 18} The trial court did not have Hoover's trial testimony before it when it decided the motion to suppress. The only evidence before the trial court was her testimony at the suppression hearing. A trial court does not err by deciding a motion to suppress based upon the evidence presented at the suppression hearing. The record does not indicate that Croom renewed his motion to suppress following Hoover's trial testimony. Thus, the trial court was not given the opportunity to reconsider the suppression issue in the light of the evidence presented at trial.

{¶ 19} Even if the trial court had reconsidered the suppression issue in the light of the evidence presented at trial, we would find no error. Discrepancies between Hoover's suppression hearing testimony and the evidence admitted at trial were for the jury to consider in evaluating her credibility and the weight to be given to her testimony, but would not inherently render her identification so unreliable as to warrant suppression.

{¶ 20} The video of the shooting does not refute Hoover's claim that the shooter was wearing a baseball cap; the video is dark and does not clearly establish that the shooter had nothing on his head. Although the other eyewitness to the shooting did testify that the person with a gun did not have on a hat, she admitted that she was in the back of the store when the shooting occurred, and she merely glimpsed a man with a gun outside the store for a matter of a few seconds. The jury could reasonably find that Hoover had the better view of the shooter, since the shooter walked right in front of her car.

{¶ 21} Hoover did not, as Croom claims, testify that Hurd got into the passenger side of his vehicle. Her testimony indicated that the victim's vehicle was traveling through the parking lot during the entire time she observed the shooting. We find nothing in the record to rebut Hoover's claim that the shooter walked in front of her car after the shooting.

{¶ 22} At the suppression hearing, Hoover did testify that the shooter was shooting into the driver's side of the victims' vehicle, but at trial she testified that Croom was actually shooting into the passenger's side of the vehicle. Hoover admitted that she had made a misstatement with regard to her suppression hearing testimony, and said that she realized her misstatement as soon as she left the suppression hearing. She testified that she immediately made note of the error to her father. While this discrepancy between Hoover's trial and suppression hearing testimony,

which she acknowledged and explained as being the result of a misstatement at the suppression hearing, is a legitimate matter for the jury to have considered in evaluating her credibility and the weight to be given her testimony, it did not render her identification testimony so unreliable as to warrant suppression.

{¶ 23}  Croom's First Assignment of Error is overruled.

## IV.  Croom's Statements to Police Officers Were Not Made
## in the Course of Plea Negotiations

{¶ 24}  Croom's Second Assignment of Error states:

THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S MOTION TO SUPPRESS STATEMENTS TO LAW ENFORCEMENT MADE DURING THE COURSE OF PLEA NEGOTIATIONS.

{¶ 25}  Croom contends that the trial court should have suppressed statements made to law enforcement officials on December 16, 2008, because they were made in the course of negotiating a plea agreement.  He argues that the statements are barred by Evid.R. 410.  The State counters with the argument that Croom did not raise any argument related to Evid.R. 410 in his motion to suppress, and that the statements were properly introduced for the purposes of impeaching Croom's testimony at trial.

{¶ 26}   On December 16, 2008, DEA Agent Noel Gaertner, Englewood Detectives Alan Meade and Richard Ring, Hurd's case agent Detective Gary Maxy, and Richmond, Indiana, Detective Andy Jury met with Croom at the DEA offices in Indianapolis.  At that time, Croom was in federal prison on unrelated charges.

{¶ 27}   According to Gaertner, Croom was asked if he knew why he had been brought in for the meeting, to which he replied that he thought it was related to law enforcement talking to his girlfriend.   Gaertner then informed Croom that he was there because it was believed that he had information regarding the murder of Hurd.   Croom said he was willing to cooperate, following which there was a discussion of Croom's family and his prior criminal history.   Croom then stated that he "wanted assurances" from the prosecutor and indicated that "hypothetically" he could tell them who killed Hurd, who was present at the crime scene, and where the weapon could be located.   According to Gaertner, Croom was repeatedly informed that "no promises" were being made regarding the prosecution of the crime, because the officials at the meeting did not have the authority to make any promises or assurances and that doing so was up to the prosecutor's office.

{¶ 28}   While the State is correct that Croom did not raise Evid.R. 410 in his written motion to suppress, the matter was raised during trial when the State attempted to impeach Croom's testimony with the statements.   Thus, we will treat the issue as properly preserved for appeal.

{¶ 29}   Evid.R. 410 provides, in pertinent part, as follows:

(A) * * * evidence of the following is not admissible in any civil or criminal proceeding against the defendant who made the plea or who was a participant personally or through counsel in the plea discussions:

* * *

(5) Any statement made in the course of plea discussions in which counsel for the prosecuting authority or for the defendant was a participant and that do not

result in a plea of guilty or that result in a plea of guilty later withdrawn.

{¶ 30} "In order to trigger the protection of Evid.R. 410, the parties must actually be involved in plea negotiations." *State v. Frazier*, 73 Ohio St.3d 323, 336, 652 N.E.2d 1000 (1995). "The test whether an accused's statements were made during plea discussions is to be determined on a case-by-case basis in light of all the facts. In determining admissibility of statements made during alleged plea discussions, the trial court must first determine whether, at the time of the statements, the accused had a subjective expectation that a plea was being negotiated. The trial court must then determine whether such an expectation was reasonable under the circumstances." *Id.* at 337.

{¶ 31} The facts in this case are similar to those in *State v. Kidder*, 32 Ohio St.3d 279, 513 N.E.2d 311 (1987), wherein the Supreme Court of Ohio held a defendant's question whether pending charges could be dropped if he was "straight up about everything" did not constitute a negotiation for a plea deal. *Id.* at 284, fn. 3. The Court opined that "Evid.R. 410 was not intended to be used to hamper police at such an early investigatory stage." *Id.*, citing 2 Weinstein & Berger, *Weinstein's Evidence*, 410-417, Paragraph 410(a) (1979).

{¶ 32} Here, Croom was informed that the investigators did not have authority to make any deals and that, despite their statements that they had no such authority, Croom asked for "assurances" of a deal in exchange for hypothetical information. We cannot distinguish this from *Kidder* and conclude that like the defendant in *Kidder*, Croom's "statements do not contain an offer to plead guilty to any charge, nor do they indicate a serious effort at negotiating such a plea." *Id.* at 317-318.

{¶ 33} Croom's Second Assignment of Error is overruled.

**V.  Croom's Convictions Are Supported by Sufficient Evidence,**

**and Are Not Against the Manifest Weight of the Evidence**

{¶ 34}  Croom's Third and Fourth Assignments of Error are:

THE JURY'S VERDICTS SHOULD BE REVERSED AS THEY WERE

AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S

MOTION FOR ACQUITTAL SINCE THE STATE FAILED TO SUPPLY

SUFFICIENT EVIDENCE AS TO ALL THE ELEMENTS NECESSARY TO

SUPPORT THE CHARGES AGAINST THE DEFENDANT.

{¶ 35}  In support of these assignments of error, Croom argues that the testimony of Hoover and "two jailhouse snitches, Damon Lewis and Latell Mays, is simply not believable by any objective standard."

{¶ 36}  A sufficiency-of-the-evidence argument challenges whether the State has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law.  *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000).  "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991),

paragraph two of the syllabus.

**{¶ 37}** The analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 38}** Hoover identified Croom as the person who fired several shots into a vehicle at the gas station.

**{¶ 39}** Damon Lewis was incarcerated with Croom in 2008. Lewis was serving a 43-year sentence for Possession of Cocaine, Possession of Marijuana with a Habitual Offender classification. He also had two prior convictions for Possession of Cocaine. According to Lewis, Hurd was "best" friends with Lewis's sister and Hurd had grown up with Lewis. Lewis also "grew up" with Rollie Mitchell. Lewis testified that he knew Tyree Smith and Billy Hicks through the drug trade. Lewis testified that he came to know Croom as "Boogie" while in prison. He testified that he and Croom became "pretty close," and that over time they began to discover that they both knew Mitchell, Smith and Hicks. They also began to discuss the Hurd murder. Lewis testified that Croom told him that Mitchell offered him money to kill Hurd, but

that he did not take the offer until Mitchell "threw in a Cadillac." Croom told Lewis that before the killing he met with Billy Hicks to finalize the details. Lewis testified that Croom admitted to traveling "two to three exits into Ohio" and then shooting Hurd eight or ten times with his weapon of choice, a .40 caliber weapon. Croom told Lewis that "Big Frank" was the only person who could say for certain that he had committed the killing. Finally, Lewis testified that he was contacted by investigators regarding his knowledge of the crime, and that he was not given any offers or inducements to testify.

{¶ 40} Latell Mayes also became acquainted with Croom while they were incarcerated together in 2010. Mayes was in prison serving a fifty-year sentence as a Habitual Offender dealing in Cocaine. Mayes testified that he was close to Hurd, and that Mitchell is his cousin. He also testified that he knows Hicks. Mayes testified that when he and Croom became acquainted, he told Croom that he was Mitchell's cousin. Croom told Mayes that he met Mitchell through his cousin "Q" [Quentin Cheshier], and that Mitchell had given Croom a red Cadillac that he had to eventually get rid of because it had become "too hot." Croom further told Mayes that he had killed "little Tony" in exchange for money and the Cadillac. According to Mayes, Croom confessed that he and Big Frank drove to Dayton and that he shot Hurd eight times with a .40 caliber weapon. Mayes testified that he told his brother to contact the police for him so that he could inform them of Croom's statements. He testified that he received no promises or benefits in exchange for his testimony.

{¶ 41} The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the finder of fact to resolve. *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

{¶ 42}   Croom claims that it is "highly suspicious" that the State just happened to find two people who knew Hurd and the other people involved in this incident.   He further claims that the testimony of Mayes and Lewis is made even more suspect by the fact that they did not approach law enforcement, but were, instead contacted by investigators.

{¶ 43}   Mayes and Lewis were involved in the drug trade in Richmond, Indiana, and as a result were familiar with many of the individuals involved in hiring Croom.   Indeed, Mayes testified that he is related to Mitchell, but he nevertheless testified that Mitchell gave Croom payment for the killing.   That both Lewis and Mayes were also close friends of Hurd is not all that surprising, given the apparent close ties between the individuals involved in the Richmond drug trade.   The testimony of Mayes and Lewis is not inherently incredible.   We conclude that the jury did not lose its way in crediting their testimony, along with Hoover's, in reaching its verdict.

{¶ 44}   In sum, the testimony of Hoover, Mays and Lewis constitutes sufficient evidence upon which a reasonable juror could rely in finding that Croom shot and killed Hurd; upon this record, the jury did not lose its way in so finding; and this is not the rare case in which a manifest miscarriage of justice has occurred.   We conclude therefore that the State presented sufficient evidence to support the conviction, and that the conviction is not against the manifest weight of the evidence.   Croom's Third and Fourth Assignments of Error are overruled.

### VI.   The Record Does Not Support Croom's Contention that He Received Ineffective Assistance of Trial Counsel

{¶ 45}   Croom's Fifth Assignment of Error states as follows:

APPELLANT WAS DENIED HIS CONSTITUTIONALLY GUARANTEED RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL MADE NUMEROUS ERRORS DURING THE COURSE OF HIS REPRESENTATION OF APPELLANT.

{¶ 46} Croom contends that his trial counsel was ineffective because counsel failed: 1) to retain an eyewitness expert; 2) to file a notice of alibi; 3) to object to calling Heather Clark as a Court's witness; 4) to object to the introduction of Tiffany Brewer's cellular telephone records; 5) to object to the rebuttal testimony of Detective Meade regarding Croom's statement that he could "hypothetically" give information regarding who committed the murder; 6) to object to the introduction into evidence of a gun taken from Croom during an unrelated arrest; and 7) to object to hearsay testimony regarding the conspiracy to kill Hurd.

{¶ 47} "In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance, and to show deficiency, the defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness." *State v. Matthews,* 189 Ohio App.3d 446, 2010-Ohio-4153, 938 N.E.2d 1099, ¶ 39 (2d Dist.).

{¶ 48} We begin with the complaint that counsel failed to retain an expert on eyewitnesses. In 2011, Croom's former attorney sought, and was given, authorization by the trial court to "obtain the services of an Eye Witness Identification expert out of Powell, Ohio." Croom claims that "such an expert was necessary due to the questionable identification by Ms.

Hoover that was going to be allowed at trial as a result of the trial court's ruling on Defendant's Motion to Suppress Identification. There is no indication in the record that defense counsel ever did anything with this authorization."

{¶ 49} We agree that there is nothing in the record indicating that counsel "did anything" with this authorization. But there is also nothing in the record to establish that trial counsel did not do anything to seek the services of an expert. On direct appeal, it is the duty of the appellant to portray error in the record, even when that error is alleged ineffectiveness of trial counsel. Because the record in the trial court, before judgment, is seldom made up on the issue of the effective assistance of trial counsel, it is often difficult for a criminal defendant to establish ineffective assistance of trial counsel in a direct appeal, or, for that matter, for the State to establish the contrary.[1] In the case before us, it may be that counsel determined that the expert was not going to provide any testimony that would help Croom. Or it may be that counsel did not want to keep reminding the jury a neutral witness saw the shooting and identified Croom as the shooter. Indeed, it appears from statements made by counsel in chambers that he did not wish to bring up the eyewitness testimony, except to attack it during closing argument. In any event, we cannot say that there is anything in this record to support Croom's claim that counsel was ineffective in this regard.

{¶ 50} Next, Croom complains that counsel failed to set forth a notice of alibi, thus preventing him from testifying thereto. Croom notes that counsel stated, again in chambers, that he did not file a Notice of Alibi, because "there was no notice of alibi to file." Croom contends

---

[1] Seemingly questionable conduct by defense counsel may have a good explanation, but the State has no opportunity at trial to discover, much less to prove, that there is a valid reason for defense counsel's conduct.

that such a statement is "nonsensical."

{¶ 51}   A review of the record shows that, in chambers, trial counsel advised the trial court and the prosecutor that Croom intended to testify against counsel's advice.   As part of that discussion, counsel stated that he did not file any notice of alibi, because there was no notice of alibi to file.   It appears from the record that Croom advised counsel that he was going to testify, despite counsel's advice, and that he intended to testify that he had an alibi.   One possibility, which the record of this direct appeal cannot gainsay, is that Croom had admitted to his trial counsel that he had no alibi – that he was in the general vicinity, at least, of the shooting, in which event defense counsel could not ethically offer Croom's perjured testimony concerning an alibi.   This would be consistent with defense counsel's having told the trial court that "there was no notice of alibi to file."

{¶ 52}   Again, there is nothing in this record to indicate that Croom had an alibi to put forth.   Furthermore, the record suggests that counsel was not aware of any potential alibi until Croom notified him that he intended to testify.   Given the state of the record, Croom has failed to portray error in this regard.

{¶ 53}   Croom also contends that counsel was ineffective for failing to object to the State's request to call Heather Clark as a court's witness.   He argues that the State did not point to any reason to suggest that Ms. Clark had been uncooperative, thereby necessitating calling her pursuant to Evid.R. 614(A).   As set forth in Part VIII, below, we conclude that calling Clark as a court's witness was not error.   Therefore, we conclude that counsel was not ineffective for failing to object thereto.

{¶ 54}   Croom next argues that counsel was ineffective for failing to object to the

introduction of Tiffany Brewer's cellular telephone records "when [she] never testified who else may have been in possession of her phone in July and August 2007."

{¶ 55} A review of the record reveals that DEA agent Gaertner testified that Brewer was in possession of her phone at the time she went to the hospital following the shooting and investigators took it from her. He further testified Brewer's cell phone records, obtained by subpoena, revealed that on August 2, 2007, between 12:25 a.m. and 2:17 a.m., there were seventeen calls between Brewer's cell phone and a phone known to be used by Billy Hicks.

{¶ 56} We find no basis for an objection by counsel. The evidence demonstrates that Brewer had the telephone in her possession when she and Hurd were shot. There is nothing to suggest that anyone else was in possession of the phone during the time in question.

{¶ 57} We next turn to the claim that counsel was ineffective for failing to object to the rebuttal testimony of Detective Meade with regard to the statement made by Croom to investigators regarding his "hypothetical" knowledge of the crime. During trial, Croom took the stand in his own defense. Upon cross-examination, the State asked Croom whether he had told Latell Mays or Damon Lewis, individuals with whom he had been incarcerated, that he killed Hurd. Croom answered negatively. The State then asked whether he "told other people that [he] was involved in this conspiracy to murder Tony Hurd." Croom again answered in the negative. The prosecutor then asked if he recalled speaking to investigators on December 16th, 2008, to which he responded, "Yes."

{¶ 58} At that point, defense counsel objected, arguing that the statement could not be admitted, because it was made during a plea negotiation, citing Evid.R. 410. The trial court heard arguments on the matter in chambers, but ultimately ruled that the statements made to the

investigators were not barred by Evid.R. 410. Thereafter, the State brought Detective Meade to the stand as a rebuttal witness. Meade testified that Croom made the statement that he could "hypothetically" tell Meade who committed the crime.

{¶ 59} We note that our review of the record indicates that counsel did object to the use of the statement. Furthermore, with regard to Meade's rebuttal testimony, counsel asked for a limiting instruction to the jury that the testimony could not be considered as evidence of guilt, but could only be used for the purpose of considering Croom's credibility. There was no basis for arguing that Croom's statements were made in the course of plea negotiations. We find no ineffective assistance of counsel in this regard.

{¶ 60} Croom also argues that counsel was ineffective because he failed to object to the admission of a gun found on Croom when he was stopped by police on an unrelated matter. Specifically, the State presented the testimony of Indianapolis Officer Charles Tice, who stated that in 2007 he was on patrol in Indianapolis when he observed "a black male on all fours behind a gray Dodge truck [who] appeared to be throwing up." Tice stopped to check on the man, who turned out to be Croom, when Croom stood up and tried to run away. Ultimately, Croom was arrested, and Tice recovered a .40 caliber Glock 22 gun from Croom. The gun was introduced in evidence without objection. However, we cannot say that counsel was ineffective. Although this gun was excluded as the gun that was used to shoot Brewer and Hurd, the shells recovered at the scene from the murder weapon were .40 caliber, and the .40 caliber Glock 22 gun found on Croom's person corroborated the testimony of Damon Lewis that Croom had admitted to Lewis that a .40 caliber firearm was Croom's weapon of choice, and what Croom had been carrying whenever he got caught with a gun.

{¶ 61} Finally, Croom contends that counsel was ineffective for failing to object to statements made by co-conspirators regarding the conspiracy to murder Hurd. Specifically he objects to the testimony of Heather Clark, Latisha Walker and DEA Agent Gaertner.

{¶ 62} Counsel initially objected to these statements by claiming that the State had not presented a prima facie case of conspiracy. Counsel did make objections during the testimony of each witness cited by Croom. Thus, we find no ineffective assistance of counsel. Furthermore, as discussed in Part VII, below, the testimony was properly admitted. Thus, we find this argument to be without merit.

{¶ 63} Croom's Fifth Assignment of Error is overruled.


**VII.   There Having Been Independent Evidence of the Existence of a Conspiracy to Commit the Crimes with which Crooms Was Charged, the Trial Court Did Not Err by Admitting Evidence of Out-of-Court Statements by the Alleged Conspirators**

{¶ 64} Croom's Sixth Assignment of Error is as follows:

THE TRIAL COURT ERRED IN PERMITTING HEARSAY TESTIMONY OF ALLEGED CO-CONSPIRATORS.

{¶ 65} Croom complains that the trial court improperly permitted the State to introduce the testimony of Heather Clark, Latisha Walker, and DEA Agent Gaertner with regard to the alleged conspiracy to kill Hurd. Croom argues that the statements constituted inadmissible hearsay. He further argues that the State failed to make a prima facie showing of conspiracy prior to introducing the testimony.

{¶ 66} Pursuant to Evid.R. 801(D)(2)(e), a statement is not hearsay if it is offered

against a party and is "a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." Independent proof of conspiracy merely requires that the State present evidence sufficient to raise the inference of conspiracy. *State v. Spires*, 7th Dist. Noble No. 04 NO 317, 2005-Ohio-4471, ¶ 40. While a proponent should establish the prima facie case prior to the admission of the statement of the co-conspirator, the failure to do so is harmless error where the conspiracy is established prior to submitting the case to the jury. *State v. Carter*, 72 Ohio St.3d 545, 551, 651 N.E.2d 965 (1995).

**{¶ 67}** Croom cites the testimony of Latisha Walker that she had informed Billy Hicks, Tyree Smith and Rollie Mitchell that Hurd had "wired up" against them during the drug buy he made as a DEA informant. She further testified that none of the men believed her.

**{¶ 68}** Croom cites the testimony of Heather Clark. Initially, Clark was evasive when asked questions by the prosecutor. Ultimately, however, she testified that shortly after Hurd was killed, she saw Rollie Mitchell speaking on the phone to Billy Hicks. Clark then drove Mitchell to an alley where he met with Hicks. She testified that during the meeting Hicks stated that they had failed on the first try, but had gotten a girl to drive Hurd somewhere the following night, where they then were able to get him. She testified that she heard Hicks say "no face, no case," and that there was also discussion regarding payment to the girl driving Hurd.

**{¶ 69}** Finally, DEA Agent Gaertner testified that when investigating Hurd's murder, he focused on the phone records of Tiffany Brewer, since she had been with Hurd when he was shot. He testified that her records showed that on the night of the shooting she and Billy Hicks exchanged seventeen calls between 12:25 a.m. and 2:17 a.m.

{¶ 70} A review of the testimony of Lewis and Mayes, recited in Part V, above, demonstrates that the State provided independent proof of a conspiracy between Croom, Mitchell and Hicks. Thus, the testimony of Gaertner, Clark and Walker was admissible under Evid.R. 801(D)(2)(e).

{¶ 71} The Sixth Assignment of Error is overruled.

## VIII. The Trial Court Did Not Abuse its Discretion by Calling Jamilla Jones and Heather Clark as its Own Witnesses

{¶ 72} The Seventh Assignment of Error asserted by Croom states:

THE TRIAL COURT ERRED IN TAKING TWO OF THE STATE'S WITNESSES AS ITS OWN WITNESSES PURSUANT TO EVIDENCE RULE 614(A).

{¶ 73} Croom argues that the trial court abused its discretion by calling Jamilla Jones and Heather Clark as court's witnesses. He contends that the State "did not reference at any time on the record any specific incidents in which either Ms. Jones or Ms. Clark had been uncooperative or not forthcoming with the State."

{¶ 74} Evid.R. 614(A) provides that "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." This rule vests the trial court with broad discretion, which may only be overturned upon a showing of abuse of that discretion. *State v. Jones*, 2d Dist. Montgomery No. 14731, 1996 WL 38940, * 4 (Jan. 31, 1996). "A witness whose appearance is important to the proper determination of the case, but who appears to be favorable to the other party, is a principal

candidate for application of Evid.R. 614(A)." *State v. Curry,* 8th Dist. Cuyahoga No. 89075, 2007-Ohio-5721, ¶ 18, citing *State v. Brewer,* 10th Dist. Franklin No. 84AP–854, 1986 WL 2652, *3 (Feb. 25, 1986). The purpose of the rule is to prevent such a witness from testifying in a manner that is "substantially at variance with the statement that he had given to police, [thereby causing the State to] be stuck with having elicited testimony harmful to the State out of the mouth of its own witness." *Jones* at *4.

{¶ 75} Heather Clark had been Rollie Mitchell's girlfriend for years, and she still maintained a romantic relationship with him. The State had difficulty locating her. The State intended to question Clark about her observations of Mitchell both before and after the murder, and about statements made by Mitchell and Hicks as co-conspirators.

{¶ 76} Jamilla Jones was dating Croom at the time of the shooting and in the months thereafter. Even after Croom was incarcerated in 2007, Jones maintained contact with him and with his family. The State intended to ask Jones questions about the Cadillac given to Croom as payment for the killing.

{¶ 77} Upon review of the record, we find no abuse of discretion in the trial court's designation of Clark and Jones as court's witnesses pursuant to Evid.R. 614. Both women maintained relationships with their respective boyfriends at the time of trial, and they were being asked to provide incriminating testimony against those boyfriends.

{¶ 78} The Seventh Assignment of Error is overruled.

### IX. Croom Having Argued, in Closing Argument, that the State's Failure to Have Called his Aunt as a Witness Supported an Inference that her

**Testimony Would have Been Favorable to Him, the State Could Properly**

**Argue, in Rebuttal, that Croom Could Have Called her as a Witness**

**if her Testimony Would, in Fact, have Been Favorable to Croom**

{¶ 79}   Croom's Eighth Assignment of Error provides:

THE PROSECUTOR'S IMPROPER REMARKS DURING CLOSING ARGUMENT ATTEMPTING TO SHIFT THE BURDEN OF PROOF TO THE APPELLANT AMOUNTED TO PROSECUTORIAL MISCONDUCT.

{¶ 80}   Croom complains that the prosecutor improperly commented upon the burden of proof thereby rendering the trial unfair.   Specifically, after closing argument by the defense, the prosecutor made the following statement:

* * * There were some statements made during Defense counsel's closing, some comments on the fact that the State may have not called certain witnesses. I think there was a mention of Brenda Cheshier, the defendant's beloved aunt. He talked about vehicle titles or BMV records.   Also, there was a mention of someone who could come forward and produce a photo of this truck.   This Dodge Ram truck.

Although the defendant has no burden of proof in this case; he does not have to prove anything.   Make no mistake, he still has the same subpoena power as the State of Ohio.   He's free to call witnesses and bring them into court and have them testify, and produce records, if he so chooses, that would support his theory of the case.

{¶ 81}   During his closing argument, defense counsel had made statements to the effect

that the State did not call his aunt, Brenda Cheshier, to the witness stand to testify that the Cadillac had been given to him as a payment for killing Hurd. He further made reference to the fact that the vehicle records show that his aunt had owned the Cadillac and that the car had been put into his girlfriend's name. Counsel further stated that there were no pictures of Croom's truck to compare to the descriptions of the getaway truck.

{¶ 82} "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. In making this determination, an appellate court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton*, 102 Ohio App.3d 28, 41, 656 N.E.2d 970 (8th Dist.1995). Moreover, the closing argument must be viewed in its entirety to determine whether it is prejudicial. *State v. Moritz*, 63 Ohio St.2d 150, 157, 407 N.E.2d 1268 (1980).

{¶ 83} Croom did not object to the above-cited passage in the prosecutor's rebuttal closing argument, and therefore failed to preserve this issue for review. In any event, we find no misconduct. A "comment that a witness other than the accused did not testify is not improper, * * * since the prosecution may comment upon the failure of the defense to offer evidence in support of its case." *State v. Clemons*, 82 Ohio St.3d 438, 452, 696 N.E.2d 1009, 1022 (1998).

{¶ 84} We find no attempt in the prosecutor's closing argument to shift the burden of proof to the defendant. The State merely, and properly, replied to defense counsel's intimation that the State's failure to offer the testimony of Croom's aunt supported an inference that her testimony would have been favorable to him, by pointing out that Croom could have offered her

testimony if it was, in fact, favorable to the defense on the issue of the Cadillac as payment for the murder.

{¶ 85}   The Eighth Assignment of Error is overruled.


### X.   No Errors Having Been Demonstrated Affecting the Validity of Croom's Conviction, the Doctrine of Cumulative Error Does Not Apply

{¶ 86}   Croom's Ninth Assignment of Error states:

THE CUMULATIVE EFFECT OF THE ERRORS OCCURRING AT TRIAL DEPRIVED DEFENDANT OF A FAIR TRIAL.

{¶ 87}    Under this assignment of error, Croom contends that the cumulative effect of errors deprived him of a fair trial. "Though a particular error might not constitute prejudicial error by itself, a conviction may be reversed where the cumulative effect of the errors deprives the defendant of a fair trial." *State v. Moore,* 81 Ohio St.3d 22, 41, 689 N.E.2d 1 (1998), citing *State v. DeMarco,* 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987). We find no error other than in connection with the order to pay restitution and extradition costs, dealt with in Part XI, below, which does not implicate the validity of Croom's conviction on the charged offense; therefore we find no cumulative error.

{¶ 88}    The Ninth Assignment of Error is overruled.

### XI.   Order to Pay Restitution and Extradition Costs   is Not Appropriate When There is No Showing of Present or Future Ability to Pay.

{¶ 89}   The Tenth Assignment of Error is as follows:

THE TRIAL COURT ERRED WHEN IT ORDERED APPELLANT TO

PAY COURT COSTS AND RESTITUTION EVEN THOUGH HE HAS NO PRESENT OR FUTURE ABILITY TO PAY SUCH A FINANCIAL SANCTION.

**{¶ 90}** The trial court ordered Croom to pay the sum of $10,291.96 to Hurd's parents for funeral expenses. The trial court further ordered Croom to pay $262 to the Montgomery County Prosecuting Attorney's Office for the costs of extradition, with the amount to be paid through the Montgomery County Clerk of Courts.

**{¶ 91}** Croom contends that because he was sentenced to a term of life in prison without parole, he has no present or future ability to pay restitution or costs. The State responds that "Croom will have the opportunity to earn wages for work while in the institution, and approved sources may deposit funds into his account [pursuant to] Ohio Adm. Code 5120-3-08 and 5120-5-02." The State contends that "it is not an undue hardship to require Croom to use those funds to make restitution to the family of the man he murdered for the expenses they incurred in burying him, or to reimburse the state for the cost of extradition."

**{¶ 92}** A defendant who does not dispute or object to an amount of restitution ordered by a trial court waives all but plain error with regard to an order of restitution. *State v. Sigmon*, 2d Dist. Montgomery No. 25149, 2013-Ohio-813, ¶ 15. Croom never objected to the restitution order. Thus, we must determine whether plain error exists.

**{¶ 93}** Restitution is a financial sanction that may be imposed as part of a felony sentence. R.C. 2929.18(A)(1). Pursuant to R.C. 2929.19(B)(5), a trial court must consider a defendant's present and future ability to pay before imposing any financial sanction under R.C. 2929.18. *State v. Sigmon,* 2d Dist. Montgomery No. 25149, 2013-Ohio-813, ¶ 16. "The trial

court does not need to hold a hearing on the issue of financial sanctions, and there are no express factors that the court must take into consideration or make on the record." *State v. Culver*,160 Ohio App.3d 172, 2005-Ohio-1359, 826 N.E.2d 367, ¶ 57 (2d Dist.). A trial court need not expressly state that it has considered an offender's ability to pay, but "the record should contain some evidence that the trial court" did, in fact, consider the ability to pay. *State v. Russell*, 2d Dist. Montgomery No. 23454, 2010-Ohio-4765, ¶ 62.

{¶ 94} The State argues that Croom can be employed in an institutional work program, and that any funds therefrom can be used to pay the restitution. We conclude that this argument is inconsistent with the requirement of R.C.2929.19(B)(5); under this argument, because all inmates can work for pay, they should automatically be subject to paying restitution. This would render superfluous the requirement that the trial court determine ability to pay. Therefore, we conclude that the possibility of working while in prison is one factor that a trial court can use in determining an inmate's ability to pay financial sanctions.

{¶ 95} In the case before us, we find no evidence in the record that the trial court considered Croom's present or future ability to pay the restitution; the trial court merely ordered Croom to make restitution. Nothing in the record suggests that Croom is anything other than a 43-year old indigent without any assets with which to pay the ordered restitution. The Pre-Sentence Investigation Report, which Croom declined to participate in, does not set forth any assets. Nor does the record indicate the level of Croom's education. While there is evidence in the record that he had worked as a "chef" in the past, there is no indication that he had any training or education in that field. Furthermore, Croom was sentenced to a term of life without parole, making it unlikely that he will be employed in the future. While it is possible that he can

be employed while in prison, there is nothing in the record upon which to reach this conclusion. Therefore, we find that the trial court committed plain error with regard to the issue of restitution.

**{¶ 96}** On the issue of extradition costs, both Croom and the State refer to this expense as a court cost that may be charged to a convicted felon under R.C. 2947.23. "The phrase 'costs of prosecution' [as set forth in R.C. 2947.23] has not been statutorily defined." *State v. Jones*, 2d Dist. Montgomery Nos. 25315, 25316, 2013-Ohio-1925, ¶ 13, citing *City of Middleburg Heights v. Quinones*, 120 Ohio St.3d 534, 2008-Ohio-6811, 900 N.E.2d 1005, ¶ 8. "The term 'cost,' however, has been defined as 'the statutory fees to which officers, witnesses, jurors and others are entitled for their services in an action or prosecution, and which the statutes authorize to be taxed and included in the judgment or sentence.' " *Id.*

**{¶ 97}** In Ohio, the extradition process is governed by R.C. Chapter 2963.01 - 2963.35, which makes no mention of assessing the expense to a convicted felon. Neither party cites any authority for including extradition expenses in the costs of prosecution. And the only statute we have found regarding a felon's payment of extradition expenses is R.C. 2949.14. That statute provides:

Upon conviction of a non-indigent person for a felony, the clerk of the court of common pleas shall make and certify under the clerk's hand and seal of the court, a complete itemized bill of the costs made in such prosecution, including the sum paid by the board of county commissioners, certified by the county auditor, for the arrest and return of the person on the requisition of the governor, or on the request of the governor to the president of the United States, or on the return of the fugitive by a designated agent pursuant to a waiver of

extradition except in cases of parole violation. The clerk shall attempt to collect the cost from the person convicted.

{¶ 98}   Based upon this statutory authority, we have held that "under R.C. 2947.23(A)(1) and R.C. 2949.14, the trial court may impose the cost of extradition upon a non-indigent felony defendant if certain criteria are met." *State v. Jones*, 2d Dist. Montgomery No. 25316, 2013-Ohio-1925, ¶ 15.   But the record in the case before us   contains no evidence that Croom is not indigent or that he has any means to pay the extradition costs.[2]   Therefore, we conclude that the trial court erred by assessing the costs of extradition against Croom.

{¶ 99}   The Tenth Assignment of Error is sustained.

## XII.   Conclusion

{¶ 100}         Croom's Tenth Assignment of Error having been sustained, that part of the judgment of the trial court ordering Croom to pay restitution and the costs of extradition is Reversed; the judgment of the trial court is Affirmed in all other respects; and this cause is Remanded for the trial court to re-consider the issue of restitution.

DONOVAN and HALL, JJ., concur.

Copies mailed to:

Mathias H. Heck
Carley J. Ingram
Marshall G. Lachman

---

[2]   The Supreme Court of Ohio has held that R.C. 2947.23 requires a trial court to impose the costs of prosecution upon all convicted felons regardless of indigency.   *State v. White*, 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, ¶ 8.   Furthermore, the Supreme Court has held that R.C.   2949.14 does not exempt indigent felons from paying the costs of prosecution.   But extradition expenses are not equivalent to court costs for this purpose, because the statute covering them only authorizes their recovery from non-indigent defendants.

Hon. Frances E. McGee