The STATE of Ohio, Appellee,

v.

MATTHEWS, Appellant.

[Cite as *State v. Matthews*, 189 Ohio App.3d 446, 2010-Ohio-4153.]

Court of Appeals of Ohio,
Second District, Greene County.

No. 08–CA–43.

Decided Sept. 3, 2010.

</div>

Stephen K. Haller, Greene County Prosecuting Attorney, and Elizabeth A. Ellis, Assistant Prosecuting Attorney, for appellee.

Flanagan, Lieberman, Hoffman & Swaim and Bajhat M. Abdallah, for appellant.

FAIN, Judge.

{¶ 1} Defendant-appellant, Sandra Matthews, a.k.a. Sandy Johnson, appeals from her conviction and sentence on one count of aggravated murder. Matthews argues that the trial court erred in denying her motion in limine to exclude testimony regarding statements made by the victim to various police and medical personnel. She maintains that trial counsel was ineffective for failing to object to this testimony at trial. She also contends that her conviction is against the manifest weight of the evidence and that it is not supported by sufficient evidence. We conclude that although some of the testimony should have been excluded, its admission is harmless beyond a reasonable doubt, because the same information was properly admitted through other witnesses. We conclude that trial counsel was not ineffective for failing to object to the testimony at trial. We also conclude that Matthews's conviction is supported by sufficient evidence and that it is not against the manifest weight of the evidence. Accordingly, the judgment of the trial court is affirmed.

I

{¶ 2} In September, 2007, Ottie Marie Tomlinson died as a result of an extensive injury to her brainstem, which had been inflicted the previous month by an ice pick driven into her left ear and passing through her brain to her right ear. The coroner ruled the death a homicide because it would have been impossible for anyone to inflict that kind of wound on herself.

{¶ 3} In August, 2007, Tomlinson shared her home with two boarders, Frank Moss and Matthews. Although Moss paid monthly rent, Matthews was unemployed and did not pay rent. Instead, she was supposed to cook and clean while she looked for work.

{¶ 4} After Tomlinson came home from work one afternoon, she and Matthews sat on the porch drinking beer. Tomlinson was angry with Matthews for not helping enough around the house and for not looking for a job. Matthews

insisted that she was looking for work and thought that she would soon have a job at Family Video. However, the store manager testified that he did not even have an application on file from her.

{¶ 5} Both Matthews and Moss explained that Tomlinson drank to excess in the evenings and that she would often become angry and argumentative as a result. When Tomlinson got that way, Matthews claimed that she would usually take her dog for a walk and stay away until Tomlinson went to bed. She claimed that this is what happened on the night of the attack. Matthews returned as Tomlinson was heading upstairs to bed, so Matthews sat in the living room to watch television.

{¶ 6} In the meantime, Moss went to his first-floor bedroom, took some pain medication, and lay down to watch television. Shortly after Moss lay down, Matthews came to his room and told him that he had a phone call. Moss had a brief conversation with the caller and returned the phone to the living room. As Moss returned to his room, he heard Matthews say, "I'm going to kill that bitch," but he admitted at trial that he did not tell the police of this threat. Moss took more pain medication and lay back down.

{¶ 7} Some time later, Tomlinson knocked on Moss's door, waking him up. He thought he heard her say that she had been stabbed and that he should call 911, so he got dressed and went to check on her. Tomlinson had gone upstairs and had lain on her bed. When Moss saw blood above her left eye, he went downstairs to get the phone. Seeing Matthews in the living room, he asked her to call 911. At some point Moss took the phone from Matthews. Believing that Tomlinson had fallen and hit her head because she was drunk, Moss did not tell either the operator or police that she had been stabbed.

{¶ 8} Although Matthews insisted that Moss went upstairs only a couple of minutes after receiving the call and that he had returned just minutes later to call 911, telephone records reveal that nearly 30 minutes had elapsed between the calls. Additionally, although in a written statement Matthews claimed to have gone upstairs to check on Tomlinson prior to calling 911, at trial, she insisted that she did not go upstairs until after she had called 911.

{¶ 9} When paramedics arrived, they found Tomlinson lying on her bed, with Matthews holding her arms down, as if trying to keep her calm. Tomlinson looked agitated and was trying to pull away from Matthews. They saw injuries above Tomlinson's left eye and on one hand, and her left ear was red and bruising. When they asked her what happened, Tomlinson responded, "Sandy stabbed me in the ear with a pen." Matthews interjected, "I'm Sandy and I wasn't even here." Tomlinson insisted, "Sandy, you stabbed me in the ear with a pen."

{¶ 10} The paramedics asked Matthews to leave the room, and once she was gone, Tomlinson calmed down noticeably, becoming more responsive to the questions and instructions of the paramedics. Several times during their examination, Tomlinson spontaneously repeated that Matthews had stabbed her in the ear with a pen. The paramedics saw blood that appeared to be running from Tomlinson's left eye, pooling in her left ear and on the bed, but they did not see anything coming from her ear.

{¶ 11} Sergeant Lane, who had followed the paramedics into the home and was waiting in the hall outside Tomlinson's bedroom, heard one of the paramedics repeating Tomlinson's explanation that Matthews had stabbed her in the ear with a pen. Lane went into the room and asked Tomlinson who had stabbed her and with what. Tomlinson told him that Matthews had stabbed her with a pen, but she did not know where the pen was at that time. Lane returned to the hallway and told Officer Kelley to get identifying information from Matthews.

{¶ 12} Tomlinson was placed in an ambulance, where paramedics heard her repeat that Matthews had stabbed her in the ear with a pen. After the ambulance left Tomlinson's home, Sergeant Lane talked to Matthews, who told him that the first she knew that something was wrong was when Moss told her to call 911 because Tomlinson had fallen. When he asked her why Tomlinson would say that Matthews had stabbed her, Matthews said, "I don't know." After a short pause, she added, "But I saw some lady leave right before I went up and found Tomlinson." When Lane sought clarification, Matthews said that the woman was Janine, who used to cut Tomlinson's hair. Matthews then explained that she had not actually seen Janine at the house that night, but that she had seen her in the neighborhood when she took her dog for a walk.

{¶ 13} When the emergency-room staff at Greene Memorial Hospital asked Tomlinson what happened to her, Tomlinson pointed to her left ear and said, "Sandy put a pen in my ear." She repeated several times that there was a pen in her ear. A doctor could see something in Tomlinson's ear canal, and he ordered a CAT scan, which revealed the presence of a metallic foreign body passing through Tomlinson's brain, from one ear to the other. The medical staff decided to have Tomlinson care-flighted to Miami Valley Hospital, where she would receive more neurological care than at Greene Memorial Hospital.

{¶ 14} Before she was transferred, Sergeant Lane went to check on Tomlinson at Greene Memorial, where he met with Detective Forrest. Medical staff told them of the results of the CAT scan. As a result of this information, any lingering doubts that Sergeant Lane had about whether Tomlinson had been stabbed or whether she had fallen evaporated.

{¶ 15} Sergeant Wilson joined Lane at the hospital. As they talked in the hallway, Tomlinson started motioning for them to approach her. When they

entered the room, Tomlinson again said that Matthews had stabbed her, but she did not know with what. Tomlinson pointed to her left ear and told them that the item was still in there. She also told them that Matthews had tried to smother her with the orange pillow. Tomlinson was so adamant to get this message across that she kept repeating it and ignoring many of Wilson's questions.

{¶ 16} Detectives Meadows and Osburn obtained a search warrant for Tomlinson's home. Under a towel on Tomlinson's bed, they found a wooden tool handle that appeared to have been recently broken off. The only noticeable amount of blood that they found in the home was on Tomlinson's bed and on an orange pillow on the floor of her bedroom.

{¶ 17} Detective Forrest interviewed both Matthews and Moss later that night. She noticed that Matthews had a small, fresh injury to her left hand. Matthews claimed to have sustained the injury while gardening with Tomlinson a few days earlier. Matthews told police that while Tomlinson was lying on her bed, she kept saying Janine's name and muttering about being stabbed. However, at trial, she testified that the only sound she heard from Tomlinson was moaning and a question about where Moss was.

{¶ 18} The day after the attack, Detectives Meadows and Osburn went to Miami Valley Hospital to see Tomlinson. She had a breathing tube and could not speak, but she did communicate by nodding and shaking her head and by writing. Tomlinson told them that Matthews had stabbed her after trying to smother her with a pillow.

{¶ 19} Tomlinson was subsequently care-flighted to Good Samaritan Hospital in Cincinnati. Three days after the attack, surgeons were able to remove the metal object, which was later identified as an ice pick. However, 37 days after the attack, Matthews died as a direct result of the injury to her brain.

{¶ 20} DNA was recovered from the wooden handle of the ice pick as well as the metal cap at the end of the handle. Most of the DNA belonged to Matthews, with a lesser amount from Tomlinson, and some had been contributed by an unidentified female. Matthews claimed that a week or two earlier, she had used the ice pick, which was stored in a kitchen drawer, to try to pry open a locked trunk for Tomlinson. Additionally, Tomlinson's blood was found on Matthews's shirt, which was found in the bathroom.

{¶ 21} Matthews told the police that she drove Tomlinson to and from work that day. At trial, she explained that she had confused the days, and she had driven Tomlinson only to work. Moss and one of Tomlinson's close friends, Dee Dee Washington, testified that Washington usually drove Tomlinson to and from work. They agreed that Washington drove Tomlinson to and from work on the day of the attack. Matthews maintained that Tomlinson had called her from

work twice that day: once in the morning to be sure that Matthews got back home, and once in the afternoon to discuss whether Tomlinson needed a ride home. But telephone records showed no calls from Tomlinson's place of work to her home, that day.

{¶ 22} At trial, Matthews denied threatening to kill Tomlinson. Matthews insisted that she had no idea how the ice pick got in Tomlinson's head and that she could not have done such a thing to a woman whom she considered a good friend.

{¶ 23} Matthews was indicted on one count of aggravated murder and one count of murder. A jury found her guilty of aggravated murder, and the trial court sentenced her to life in prison without parole. From her conviction and sentence, Matthews appeals.

## II

{¶ 24} Matthews's first assignment of error is as follows:

{¶ 25} "The trial court committed reversible error when it overruled appellant's motion in limine and allowed the prosecution to produce hearsay testimony and statements."

{¶ 26} In her first assignment of error, Matthews argues that the trial court should have sustained her motion in limine to exclude testimony regarding Tomlinson's statements that Matthews had stabbed her in the ear, made to various police officers and medical staff. She claims that the trial court's admission of this evidence deprived her of her right to confront Tomlinson, guaranteed her under the Sixth Amendment of the United States Constitution. Although the state correctly points out that Matthews failed to preserve this issue by failing to object to the testimony at trial, we will address her arguments, since they directly relate to her ineffective-assistance-of-counsel claim raised in her third assignment of error. We conclude that the majority of the testimony was admissible, and while some of the testimony should have been excluded, any error in allowing it is harmless beyond a reasonable doubt, because the same information was properly admitted through other witnesses.

{¶ 27} Not all hearsay implicates the Sixth Amendment Confrontation Clause, which establishes that testimonial statements of witnesses who are absent from trial are admissible only when the witness is unavailable and where the defendant has had a prior opportunity to cross-examine the witness. *Crawford v. Washington* (2004), 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177. "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington* (2006), 547 U.S. 813, 821, 126

S.Ct. 2266, 165 L.Ed.2d 224. However, the United States Supreme Court specifically avoided any comprehensive definition of what constitutes a "testimonial" statement. *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 28} Matthews argues that the statements offered by the first paramedic on the scene and to a medical technician who participated in the triage of Tomlinson when she arrived at Greene Memorial Hospital should have been excluded. We disagree. "Statements made to medical personnel for purposes of diagnosis or treatment are not inadmissible under *Crawford* because they are not even remotely related to the evils that the Confrontation Clause was designed to avoid." (Citations omitted.) *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 63. See also *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 25. Statements of this kind are not testimonial in nature. Instead, they fall within a well-defined exception to the hearsay rule for statements made for the purpose of medical diagnosis or treatment. Evid.R. 803(4).

{¶ 29} The fact that Tomlinson told every person she encountered that she had been stabbed in the ear does not negate the fact that the information was provided in order to receive appropriate medical treatment. The paramedics were initially dispatched on a report of a fall, and it was important for them to learn the true nature of Tomlinson's injury. The inability of the paramedics in her home, and the first medical personnel in the hospital, to see anything in her ear may have prompted Tomlinson's spontaneous repetitions that she had been stabbed in the ear. A CAT scan was ordered, revealing the extent of Tomlinson's injury, only after the emergency-room doctor finally saw something in her ear. The result of the CAT scan allowed Tomlinson to receive the proper treatment in the most appropriate setting.

{¶ 30} Matthews also insists that the statements of Sergeants Lane and Wilson and those of Detectives Meadows and Osburn should have been excluded. When the challenged statements have been made to a law-enforcement officer, the trial court must consider what the primary purpose of the questioning was. *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶ 28. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 31} Due to the report that Tomlinson had been drinking heavily, Sergeant Lane was dispatched to be a protective presence for the paramedics in the event

that she or another occupant of the home became belligerent. When Lane overheard a paramedic repeating Tomlinson's claim to have been stabbed, he realized that rather than an accidental fall, a crime may have just been committed. Because it was possible that the attacker was still present in the home, and perhaps armed, Sergeant Lane was confronted with an ongoing emergency. His brief questions were asked in order to protect himself, Tomlinson, and the paramedics from any potential risk, rather than with any goal of obtaining information that might assist an eventual criminal prosecution. Thus, Tomlinson's initial statements to Sergeant Lane were not testimonial in nature and were not subject to the Confrontation Clause.

{¶ 32} Tomlinson's initial statements to Sergeant Lane were admissible as an exception to the Ohio hearsay rule as excited utterances. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). Tomlinson's initial statements were made very shortly after Tomlinson had had an ice pick driven through her head, undeniably a startling event to say the least. See, e.g., *State v. Taylor* (1993), 66 Ohio St.3d 295, 612 N.E.2d 316.

{¶ 33} On the other hand, the additional statements sought by Sergeants Lane and Wilson from Tomlinson later that night, as well as the statements obtained the following day by Detectives Meadows and Osburn, were testimonial in nature and therefore would have been admissible only if Matthews had had the opportunity to cross-examine Tomlinson. *Crawford,* 541 U.S. at 59, 124 S.Ct. 1354, 158 L.Ed.2d 177. The emergency of the situation at Tomlinson's home was no longer ongoing, and any further statements were sought in furtherance of a likely criminal prosecution. These are precisely the kind of statements that the *Crawford* court explained the Confrontation Clause was intended to exclude because they were " 'statements * * * made under circumstances which would lead an objective witness to reasonably believe that the statement would be available for use at a later trial.' " Id. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177, quoting *White v. Illinois* (1992), 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (Thomas, J., concurring in part and in judgment).

{¶ 34} Nevertheless, any error in allowing this testimony was harmless beyond a reasonable doubt because the information was properly before the jury through Tomlinson's initial statement to Sergeant Lane and through the statements to medical personnel in the course of Tomlinson's evaluation and medical treatment.

{¶ 35} The state argues that Tomlinson's statements were admissible as dying declarations under Evid.R. 804(B)(2). Dying declarations are one well-

established exception to the general rule of excluding hearsay because they are not testimonial in nature. *Crawford,* 541 U.S. at 56, fn. 6, 124 S.Ct. 1354, 158 L.Ed.2d 177, citing *Mattox v. United States* (1895), 156 U.S. 237, 243–244, 15 S.Ct. 337, 39 L.Ed. 409. However, beyond the horrific nature of Tomlinson's injury, there is no evidence that she believed she was dying. A grievous wound and the victim's being in critical condition alone are not enough to establish the deceased's sense of impending death. See, e.g., *State v. Brust* (Mar. 28, 2000), Franklin App. No. 99AP–509, 2000 WL 311921, citing *State v. Tesfagiorgis* (Aug. 12, 1999), Franklin App. No. 98AP–1215, 1999 WL 604118, in turn citing *State v. Woods* (1972), 47 Ohio App.2d 144, 147, 1 O.O.3d 244, 352 N.E.2d 598.

{¶ 36} Matthews's first assignment of error is overruled.

### III

{¶ 37} Matthews's third assignment of error is as follows:

{¶ 38} "Appellant received ineffective assistance of counsel, as trial counsel failed to object to hearsay evidence, thereby violating appellant's right to due process under the Fifth and Fourteenth Amendment[s] of the United States Constitution and Article I Section 10 of the Ohio State Constitution."

{¶ 39} In her third assignment of error, Matthews contends that trial counsel was ineffective for failing to object to trial testimony from various medical and law-enforcement personnel that Tomlinson had told them that Matthews stabbed her in the ear. In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance, and to show deficiency, the defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness. Id.

{¶ 40} As discussed in response to Matthews's first assignment of error, some of the testimony from law-enforcement officials should have been excluded because it was testimonial in nature. But even if we were to conclude that trial counsel demonstrated deficient performance in failing to object to the testimony at trial, Matthews cannot demonstrate any resulting prejudice, because the same information was properly admitted through other witnesses. Accordingly, Matthews's third assignment of error is overruled.

### IV

{¶ 41} Matthews's second assignment of error is as follows:

{¶ 42} "The jury's finding of guilt was not supported by the weight of the evidence."

{¶ 43} In her second assignment of error, Matthews maintains that her conviction is not supported by sufficient evidence and that it is against the manifest weight of the evidence. We disagree.

{¶ 44} A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. The proper test to apply to such an inquiry is the one set forth in *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." In contrast, when reviewing a judgment under a manifest-weight standard of review, "[t]he court reviewing the entire record[ ] weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [fact-finder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction." *Thompkins*, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 45} Matthews's arguments essentially challenge the credibility of the states witnesses and the states version of the events on the night of Matthews's attack on Tomlinson. The credibility of witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212. The jury heard the testimony of all of the witnesses and saw their demeanor on the stand. Because the jury "is particularly competent to decide 'whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." *State v. Spears*, 178 Ohio App.3d 580, 2008-Ohio-5181, 899 N.E.2d 188, ¶ 12, quoting *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684 "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict." *State v. Pounds*, Montgomery App. No. 21257, 2006-

Ohio-3040, 2006 WL 1661632, ¶ 39, citing *State v. Bradley* (Oct. 24, 1997), Champaign App. No. 97–CA–03, 1997 WL 691510.

{¶ 46} First, Matthews argues that she was physically incapable of committing the crime. The jurors heard the coroner's testimony regarding the path that the ice pick took as it passed through Tomlinson's head and the force necessary to inflict the injury. The coroner, who described herself as a strong woman, testified that she could have inflicted the injury. The jurors saw the coroner and Matthews, and they were in the best position to compare the women's relative ages, physical builds, and apparent strength. It is within the jury's role as fact-finder to determine whether Matthews could have inflicted the injury.

{¶ 47} Matthews also maintains that the state failed to prove the element of prior calculation and design because, even if she had assaulted Tomlinson, the only way she could have had the strength to drive the ice pick through Tomlinson's head was if she was fueled by momentary rage. However, anger is not inconsistent with prior calculation and design. In any event, Moss overheard Matthews's threat to kill Tomlinson less than 30 minutes before the attack. And Matthews appears to have put some thought into her choice of weapon—she took the time to go from the living room to the kitchen to retrieve the ice pick from a drawer before going upstairs to Tomlinson's bedroom.

{¶ 48} Matthews challenges Moss's credibility due to inconsistencies in his prior statements and trial testimony. However, Matthews, through counsel, thoroughly cross-examined Moss about those inconsistencies, and the jury was capable of evaluating Moss's credibility after seeing him on the witness stand and hearing his testimony.

{¶ 49} Matthews insists that the states sequence of events was unbelievable because in light of the severity of her injury, Tomlinson could not have gone down the stairs and then back up, and even if she had been capable of doing so, she would have left blood along the way. Although the coroner was very surprised that someone with Tomlinson's injury was ambulatory, she was equally surprised that she was awake and coherent. As for there being no blood outside of Tomlinson's bedroom, the coroner explained that while the ice pick remained in Tomlinson's head, there would be relatively little bleeding.

{¶ 50} Next, Matthews argues that Tomlinson's identification of her as the assailant was not reliable for three reasons: Tomlinson was drunk; there was "absolutely no possibility" that she saw her attacker; and Tomlinson exhibited "a pattern of providing the accusation * * * and then shrugging off any follow-ups."

{¶ 51} As for Tomlinson's being drunk, the jury was well aware of this fact and was in the best position to determine whether that intoxication was sufficient to

render Tomlinson incapable of recognizing one of the people who shared her home.

{¶ 52} Matthews bases her presumption that Tomlinson could not have seen her attacker on the coroner's opinion that it was likely that Tomlinson was asleep on her side when she was struck. In fact, Tomlinson told Detective Meadows that she was asleep when she was attacked. It is likely that upon being struck, she looked to see who had hit her. In any event, this is a factual determination best left to the jury, who saw all of the witnesses and heard all of the testimony.

{¶ 53} Finally, Matthews says that Tomlinson just jumped to the conclusion that Matthews had stabbed her, as evidenced by her inability to provide more information. It is unclear what additional information the mortally wounded woman could have provided. Most of the witnesses agreed that Tomlinson was responsive to their questions and instructions. Furthermore, Tomlinson did explain the nature of the argument that led up to the attack. If Tomlinson had been asleep when Matthews attacked, she would not have been aware of what happened in the minutes immediately before the attack. It is also significant that the coroner testified that the injured part of Tomlinson's brain was unrelated to her ability to remember information.

{¶ 54} Matthews was convicted of aggravated murder in violation of R.C. 2903.01(A), which states: "No person shall purposely, and with prior calculation and design, cause the death of another." Viewing the evidence, as we must, in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime of aggravated murder beyond a reasonable doubt. Therefore, Matthews's conviction is supported by sufficient evidence. Furthermore, the jury's verdict reflects that it found the testimony of the state's witnesses to be more credible than that of Matthews. A jury does not lose its way simply because it chooses to believe the states witness over the defendant's. *Pounds*, 2006-Ohio-3040, 2006 WL 1661632, at ¶ 40. Based on the record before us, we conclude that Matthews's conviction is not against the manifest weight of the evidence.

{¶ 55} Matthews's second assignment of error is overruled.

V

{¶ 56} All of Matthews's assignments of error having been overruled, the judgment of the trial court is affirmed.

Judgment affirmed.

BROGAN and FROELICH, JJ., concur.