[Cite as *State v. Pope*, 2013-Ohio-4821.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

STATE OF OHIO

      Plaintiff-Appellee

v.

KENNETH POPE, JR.

      Defendant-Appellant

Appellate Case No.    25306

Trial Court Case No.   2009-CR-2683/2

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

# O P I N I O N

Rendered on the 1st day of November, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by CARLEY J. INGRAM, Atty. Reg. No. 0020084, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

ELIZABETH C. SCOTT, Atty. Reg. No. 0076045, 120 West Second Street, Suite 603, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Kenneth Pope, Jr., appeals from his conviction and sentence on four counts of Murder, with firearm specifications, and one count of Having a Weapon Under Disability. After merger, Pope was sentenced to a total of 36 years to life in prison for the murders of Gerald Brown and Dennis Glover.

{¶ 2} Pope contends that his conviction is against the manifest weight of the evidence. He also maintains that the State presented insufficient evidence to support the conviction. In addition, Pope argues that the trial court erred by sentencing him to consecutive sentences. Finally, Pope contends that his due process rights were violated as a result of cumulative errors during the trial, including ineffective assistance of counsel, prosecutorial misconduct, and the court's failure to obtain an express waiver of Pope's Fifth Amendment right against self-incrimination.

{¶ 3} We conclude that the conviction is not against the manifest weight of the evidence, and that the State presented sufficient evidence to support the conviction. We further conclude that Pope's due process rights were not violated as the result of cumulative errors during trial. However, the trial court did err in failing to make the required findings for imposing consecutive sentences under R.C. 2929.14(C). Accordingly, this matter will be affirmed in part and reversed in part, and will be remanded solely for the purpose of giving the trial court the opportunity to make the requisite findings under R.C. 2929.14(C).

## I. Facts and Course of Proceedings

{¶ 4} This case arose from the murders of Gerald Brown and Dennis Glover on March

17, 2009. At the time, Brown lived at 515 North Broadway, Dayton, Ohio, in an admitted "dope house," where drugs, including crack cocaine, were sold and consumed. The house had two entrances – a front door that sellers were permitted to use, and a side door, where customers came to purchase drugs. The side entrance had stairs leading down to a basement, and stairs that led up to the main floor. Customers were allowed into the basement to use drugs.

{¶ 5} Both doors were generally locked, and a doorman was stationed at each door. The front doorman looked out the window, watching for the police and to see who was out front. The side doorman answered the door and admitted customers. Brown also had two "house guns" that were used for protection.

{¶ 6} The people who normally sold drugs from the house were Gerald Brown, Dennis Glover, Levar Stinson, Kenneth Pope, Terrence Snowden, Sammie Jones, and Jermaine Maddox. Jones lived at the house and additionally acted as a doorman. Another individual, Sherrone Cord, also acted as a doorman.

{¶ 7} On the day of the murders, Defendant, Kenneth Pope, arrived at the house at around 10:15 a.m. Pope had parked his car down the street, because he did not think it was a smart idea to park in front of the dope house.

{¶ 8} Pope was a part-time drug dealer, and made between $300 and $1,000 per week selling drugs while attending college. The other accused killer, Terrence Snowden, was not related to Pope, but was a cousin of Pope's half-brother, Kenneth Snowden. Gerald Brown was a close friend of Kenneth Snowden's family.

{¶ 9} Levar Stinson arrived at the house at 11:00 or 12:00 p.m. When Stinson arrived, Pope, Maddox, Cord, Jones, and Brown, were there, as well as Stinson's cousin, Mark.

Everyone other than Jones was on the main level. Jones was down in the basement with two customers, Sara and Tracy.

{¶ 10} Snowden eventually arrived at around 2:30 p.m. Before Snowden arrived, Mark was sent out to get a gun. After Mark left, Stinson and Glover were sitting talking in a back room. When they came out, Pope was holding a house gun on Brown, stating that he "finally" got the gun. According to Stinson, Pope was mad about money issues and about not being able to get the gun when he wanted it. Pope was also upset because Stinson was selling dope out of the house and only a limited number of customers were available for the sellers.

{¶ 11} Stinson talked to Pope and finally got him to put the gun away. Pope kept the gun, but everyone sat and "chilled." Although Pope was on his cell phone, Stinson was not really paying attention to Pope because he thought the incident was over.

{¶ 12} Around this time, Jones came upstairs and was sent out to purchase more drugs, because there were no drugs left to sell. Jones then left the house, and saw Snowden coming in through the front door. After Snowden arrived, the argument escalated. Snowden was mad because people were making more money than he was selling dope out of the house. In particular, Snowden was angry because Glover was making more money than he was. Snowden stated that if he couldn't make any money in there, no one would make any money, that the house would be leveled to a parking lot. Snowden smacked Brown in the face, told him he was sick of his sh*t and that Brown was not his "cousin" anymore.[1] Snowden indicated that when he said he was going to rob the "spot" (referring to the drug house), he was not talking about robbing Brown, but would now rob Brown since Brown was no longer his "cousin."

---

[1] "Cousin" apparently refers either to a close friend or to a blood relative.

{¶ 13}   Shortly thereafter, Pope signaled Glover to come with him to Brown's bedroom. When they came back to the living room, Snowden asked Pope what he had gotten. Pope threw some money on the table in the living room. Stinson then began yelling at Glover, asking if he had just been robbed.

{¶ 14}   At this point, Snowden held out a gun and told Stinson, Glover, and Brown to strip. Pope also had a gun out and was covering with it. Stinson, Glover, and Brown were being moved toward a corner of the room.

{¶ 15}   Sensing trouble, Cord tried to leave, but Snowden and Pope stopped him by the front door. They pushed the door closed, grabbed Cord by the arm, and pulled him back into the living area. In an angry tone, Pope said that Cord was not going anywhere. Pope then hit Cord in the back of the head, and Cord fell to the ground. He was still conscious and could hear, but he could not see anything.

{¶ 16}   Almost immediately after Cord fell, Stinson heard a shot. Both Pope and Snowden pointed their guns and shot. Stinson grabbed a gun and shot back. When the first exchange of fire occurred, Stinson grabbed Glover and started running for the window in the back of the house. However, Glover had seen Brown get shot, and wanted to help Brown. Stinson exchanged fire again with Pope and Snowden, and this time, Glover was hit. When Glover was hit, he spun around. Brown landed next to Glover and on top of Stinson. At this point, Stinson heard Pope and Snowden whispering. They walked toward Stinson, and he closed his eyes and acted like he was dead. Stinson heard Pope ask if they were dead. Stinson then heard Pope and Snowden run for the stairs by the basement. Stinson threw Brown off and jumped out the bathroom window. By this time, Cord was at the side window and helped

Stinson up. As they came around the house, Stinson saw Pope and Snowden coming around the left-hand side of the house, running together. Pope and Snowden ran across the street, passed a barber shop, and kept running. In the meantime, the two women who had been in the basement also ran away from the house.

{¶ 17} Jones returned to the house, discovered the injured men, and called 911. When the police arrived, they found Jones sitting on a couch, sobbing. One man was alive and was trying to get up, while the other had a clear gunshot wound to the head, but appeared to be alive. Ultimately, Brown died as the result of a gunshot wound to the abdomen, and Glover died as a result of a gunshot wound behind his right ear.

{¶ 18} The police interviewed Jones and Cord on the day of the crime, and Cord identified Snowden and Pope from photo spreads. No firearms were recovered from the scene.

{¶ 19} The day after the crime, Pope met with an attorney, and then voluntarily came with his lawyer to the Dayton Safety Building for an interview. Initially, Pope told the police that he had been visiting Brown, who was a good friend. Pope claimed that his stepbrother, Terrence Snowden, showed up around 2:00 p.m., was all "hyped up," and was arguing with Brown. Pope denied having a gun, and stated that he did not know why Snowden was upset with Brown. He also said that when he tried to leave, Cord stopped him at the front door of the house. Cord grabbed him and asked where he was going. Pope responded by punching Cord. When he did so, he heard multiple gunshots, but did not know who was shooting. As a result, Pope crawled down the hallway to a weight room and dove through a window to escape. After running into Snowden outside the house, he and Snowden went to his car. Pope dropped Snowden off at the house of his brother, who was related to Snowden.

**{¶ 20}** After the police confronted Pope with the fact that witnesses had seen him with a gun, Pope admitted that he had a gun. Pope then said he had been handed the "house gun," a .22 long revolver, around noon. Pope also stated that when he tried to leave, he picked up the house gun, which was on a green chair by the front door, and hit Cord in the head. Otherwise, Pope's story remained the same.

**{¶ 21}** Pope claimed that he had broken the glass of the window when he dove through it, and had received some abrasions and injuries. The police took pictures of Pope's injuries, which showed abrasions or cut marks on the right arm, left arm, and chest area, a laceration to the chin, and abrasions to the shin. Pope also told the police that Stinson had fired shots first.

**{¶ 22}** When the police told Pope that it was important to obtain the gun to check it against the evidence at the scene, Pope and his attorney left to get the gun. When they returned, the building was closed, and the officer with whom they had been speaking had left for the day. Pope's attorney then gave a long .22 nine-shot revolver to the police. This gun was operable, but none of the bullets or bullet fragments from the crime scene matched the gun. There were also glass fragments stuck in the butt of the gun, which could have been caused by the gun having been used to break a window.

**{¶ 23}** Stinson did not talk to the police until June 2009, when his parole officer put out a capias warrant because the police wanted to talk to him. Stinson claimed that he was afraid to talk with police because he had been receiving threats, and also was on parole. Stinson identified Pope and Snowden, and told police that he had seen Snowden shoot Brown. He also said that he saw Pope shooting.

**{¶ 24}** Snowden was indicted in December 2011 on four counts of Murder, with

firearm specifications, and one count of Having a Weapon Under Disability, in connection with the deaths of Brown and Glover. Pope took the stand at trial, and testified to a third version of events. At trial, Pope claimed that he had initially lied about the gun because he was on parole and wanted to avoid going back to prison. He told basically the same story about the events leading up to the shooting. However, with respect to his actions shortly before the shooting, he claimed that he had gone to the side door to handle a customer because Snowden was arguing with everyone. Cord opened the door, and the customer began complaining that Cord had been skimming dope. Pope stated that he made things right with the customer, but then began arguing with Cord at the side door. Pope told Cord that he did not want him to work the door anymore. Pope then hit Cord with a gun while they were on the stairs by the side door. This would have placed Pope out of the vicinity of the living room, where the shootings occurred.

{¶ 25}    Pope testified that Cord fell down on the steps when he hit him, and that he (Pope) immediately heard shots. Instead of going out the side door to get away, Pope claimed that he crawled down the hallway to the back because he knew people were shooting and he thought it was safer to go out the back. As before, he indicated that he broke the window with the butt of the gun, and jumped out the window. He stated that as soon as he got out of the house, he started running for his car, and met up with Snowden, who followed him to his car. There was blood on Snowden's shirt and Snowden thought he had been shot. Snowden was hysterical and kept saying that Var (Levar Stinson) had shot him. Snowden discovered on the way to Pope's brother's house that he had not been shot, and Pope dropped him off at the house. Pope then consulted an attorney and went to the police the next day.

{¶ 26}    Following a jury trial, Pope was convicted on all charges, other than the Having

Weapons Under Disability charge, to which he had previously pled guilty. Pope was sentenced as indicated above, and appeals from his conviction and sentence.

## II.   Is Pope's Conviction Against the Manifest Weight of the Evidence?

{¶ 27}   Pope's First Assignment of Error is as follows:

> Mr. Pope's Conviction Is Against the Manifest Weight of the Evidence.

{¶ 28}   Under this assignment of error, Pope contends that his conviction is against the manifest weight of the evidence. In this regard, Pope argues that his weapon did not match the bullets that killed the victims, and that the State failed to present credible evidence that he and Snowden acted together.

{¶ 29}   The standard for reviewing manifest weight claims is well-established. "When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 30}   After reviewing the record in its entirety, we conclude that this is not the exceptional case in which the evidence weighs heavily against the conviction. The testimony of

the State's witnesses, if believed, indicates that Pope aided and abetted in the murders of Brown and Glover.

{¶ 31}   The jury was charged that Pope could be held responsible for the murders either as a principal offender or as an aider and abettor.  With respect to aiding and abetting, R.C. 2923.03(A) provides that "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * (2) Aid or abet another in committing the offense * * *."

{¶ 32}   Aiding and abetting means that "the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.  Such intent may be inferred from the circumstances surrounding the crime."  *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001).  In *Johnson*, the court also agreed with the proposition that " '[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' "  *Id.*, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

{¶ 33}   According to Stinson's testimony, Pope and Snowden were both upset about the fact that they were not making more money at the drug house.  Snowden indicated that he intended to rob the house, and Pope actually went into another room and obtained money from Glover.  Pope struck and injured one person to prevent him from leaving, and, according to Stinson, held the victims at gunpoint and participated in the shoot-out.  In addition, Pope and Snowden were seen leaving the scene together.  Pope also drove the gunman to his brother's house, and, thus, assisted in his getaway.

**{¶ 34}**     Although Pope denied being involved, he told several versions of his story, and his testimony at trial lacked credibility under standards relating to manifest weight and the appellate court's duty to review the entire record and consider witness credibility.   Accordingly, the conviction is not against the manifest weight of the evidence.

**{¶ 35}**     The First Assignment of Error is overruled.


### III.   Is the Conviction Supported by the Evidence?

**{¶ 36}**     Pope's Second Assignment of Error states that:

The Evidence Presented by the State Was Insufficient to Convict Mr. Pope.

**{¶ 37}**     Under this assignment of error, Pope contends that there was insufficient evidence to support his conviction because no forensic evidence tied him to the shooting, and no credible evidence showed that he aided and abetted Snowden.

**{¶ 38}**     "A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law."   *State v. Cherry*, 171 Ohio App.3d 375, 2007-Ohio-2133,   870 N.E.2d 808, ¶ 9 (2d Dist.), citing *Thompkins*, 78 Ohio St.3d at 387,   678 N.E.2d 541.   "The proper test to apply to the inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492: 'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.   The relevant

inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Cherry* at ¶ 9.

{¶ 39} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 40} We have already concluded that Pope's conviction is supported by the weight of the evidence. Therefore, under the reasoning expressed above, the conviction is also supported by sufficient evidence.

{¶ 41} Pope's Second Assignment of Error is overruled.

### IV.  Did the Trial Court Err in Imposing Consecutive Sentences?

{¶ 42} Pope's Third Assignment of Error is as follows:

The Trial Court Erred by Sentencing Mr. Pope to Consecutive Sentences.

{¶ 43} Under this assignment of error, Pope contends that the trial court erred in imposing consecutive sentences because the court failed to make specific findings, as required by statute. Pope notes that the trial court mentioned Pope's prior felony convictions, and that he was on supervision when the crime was committed. However, Pope also stresses that the court

failed to find that those factors were used in sentencing him to consecutive sentences, as required by statute.

{¶ 44}   The State concedes that the trial court failed to refer specifically to R.C. 2929.14(C).   Despite this omission, the State contends that the statutory findings are implicit in the court's rationale for the sentence that was imposed.   Alternatively, the State argues that the proper remedy is a remand for the trial court to explicitly place its findings on the record.

{¶ 45}   "Effective September 30, 2011, Ohio law requires judicial fact-finding for consecutive sentences."   *State v. Forney*, 2d Dist. Champaign No. 2012-CA-37, 2013-Ohio-3034, ¶ 8, citing   *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 46 (2d. Dist.) "Specifically, a trial court must find 'that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public[.]' " *Id.*, quoting R.C. 2929.14(C)(4).   In addition, the court must also find one of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately

reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. R.C. 2929.14(C).

**{¶ 46}** Although the trial court mentioned the fact that Pope was on post-release control at the time of the offense, the court did not make the findings required by R.C. 2929.14(C). Consequently, the Third Assignment of Error has merit. We agree with the State that the proper remedy is to remand the case to give the trial court the opportunity to explicitly place its findings on the record.

**{¶ 47}** The Third Assignment of Error is sustained.

V. Were Pope's Due Process Rights Violated?

**{¶ 48}** Pope's Fourth Assignment of Error states that:

Mr. Pope's Due Process Rights Were Violated Due to Cumulative Errors Committed Throughout His Trial.

**{¶ 49}** Under this assignment of error, Pope raises the issue of cumulative error, based on three grounds: ineffective assistance of counsel; prosecutorial misconduct; and violation of the Fifth Amendment right against incrimination. We will consider each matter separately.

**{¶ 50}** The doctrine of cumulative error was recognized in *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987). *State v. Powell,* 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *DeMarco* at paragraph two of the syllabus. "Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of

a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *Id.,* citing *DeMarco* at 196-197. (Other citations omitted.)

## A. Ineffective Assistance of Counsel

{¶ 51} Pope's first ground of cumulative error is that trial counsel was ineffective by failing to move for acquittal under Crim.R. 29, and by failing to move to exclude the unindicted "bad act" of Pope's having assaulted Sherrone Cord.

{¶ 52} "In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice." *State v. Matthews* , 189 Ohio App.3d 446, 2010-Ohio-4153, 938 N.E.2d 1099, ¶ 39 (2d Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance, and to show deficiency, the defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness." *Id.*, citing *Strickland* at 690.

{¶ 53} As a preliminary matter, we note that Pope's counsel moved for acquittal under Crim.R. 29 at the conclusion of the State's case, and the motion was overruled. Amended Transcript of Proceedings, Volume IV., p. 738. Pope's counsel did fail to move for acquittal at the end of all the evidence. However, even if this were considered deficient performance, counsel's failure was not prejudicial. The trial court had already overruled one motion for acquittal. Furthermore, Pope's primary evidence consisted of his own testimony, and we have previously noted that his testimony lacked credibility.

{¶ 54} As an additional matter, trial counsel was not ineffective by failing to object to

admission of other crimes or wrongs.   Under Evid.R. 404(B), "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."

**{¶ 55}**   However, Pope's assault of Cord was not offered as proof of Pope's bad character.   Instead, it was relevant to the claim that Pope was aiding and abetting Snowden by preventing a possible witness from leaving.   Furthermore, Pope also presented evidence of the assault during his own case, in an attempt to show that he was not present in the area where the shooting occurred.   Defense counsel, therefore, was not ineffective in failing to object to this evidence.

### B.   Prosecutorial Misconduct

**{¶ 56}**   Pope's second claim of cumulative error is based on prosecutorial misconduct. Pope contends that the prosecution committed misconduct in several ways, including: (1) improperly characterizing the presumption of innocence during voir dire; (2) lodging frivolous objections during voir dire; (3) vouching for a state witness during opening statements; (4) telling the jury during opening statements that it is the jury's "job factually to conclude that this [crime] happened"; (5) arguing with defense counsel in the presence of the jury; and (6) making various remarks during Pope's cross-examination that were passive-aggressive, disrespectful, or implied that Pope had lied.

**{¶ 57}**   In *State v. Jeffery*, 2013-Ohio-504, 986 N.E.2d 1093 (2d Dist.), we noted that:

> The test for prosecutorial misconduct is whether the remarks were improper, and if so, whether they prejudicially affected the accused's substantial

rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The question is whether the prosecutor's misconduct so infected the accused's trial with unfairness that the accused's convictions came in violation of the right to due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 644, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). *Jeffery* at ¶ 15.

{¶ 58}   We have reviewed the entire record, and conclude that Pope received a fair trial. As a preliminary point, we note that the State's remark about the presumption of innocence was not incorrect. The State merely commented that the law does not say that a defendant is innocent; it says that the defendant is presumed innocent until proven guilty. Amended Transcript of Proceedings, Volume II, pp. 94-95. During later discussion, the State noted, and the trial court agreed, that a defendant is presumed innocent as he starts, but that is different from a factual assertion that the defendant is innocent. *Id*. at p. 207. The defense also failed to object to the prosecution's initial statement.

{¶ 59}   Furthermore, contrary to Pope's claim, the trial court sustained several State objections during defense counsel's voir dire. *Id.* at pp. 200, 206-207, and 211. Two objections were overruled, but this does not mean that the objections were frivolous. We have reviewed the record and find nothing improper about the objections that were made during voir dire.

{¶ 60}   The State's objections during defense counsel's opening statement were also not frivolous. For example, on one of the occasions Pope cites, the State objected to Pope's behavior, which included shaking his head and even commenting aloud during the opening

statements of both the State and defense. When the State objected, defense counsel indicated that he was not aware of Pope's actions. The trial court instructed defense counsel to tell Pope not to do that anymore. *Id*. at pp. 277-278.

{¶ 61}    In addition, of the two remaining objections cited by Pope, one was sustained and one was overruled. *Id.* at pp. 280-285 and 286. Again, we have reviewed the record, and these items do not constitute misconduct.

{¶ 62}    The next instance of alleged misconduct relates to the prosecution's having vouched for a witness during opening statement. In this regard, we note that the prosecutor discussed the work of the crime laboratory in its opening statement. The prosecutor then said, "the rest of the work is left to a guy we all know and love at the Miami Valley Regional Crime Lab. * * * His name is Chris Monturo. He's an expert at a lot of things and I say it worshipfully, not sarcastically." *Id*. at p. 260.

{¶ 63}    This was an improper comment on the credibility or status of a State witness. "[A] prosecutor may not give his personal opinion about the credibility of witnesses, [but] the prosecutor may comment fairly on the credibility of witnesses based on their in-court testimony, or may even suggest to a jury that the evidence demonstrated that the witness was lying." (Citations omitted.) *State v. Herron*, 2d Dist. Montgomery No. 19894, 2004-Ohio-773, ¶ 81. In the case before us, the remark occurred before Monturo testified, and can fairly be seen as a comment on Monturo's credibility.

{¶ 64}    Nonetheless, the remark did not prejudicially affect Pope's substantial rights. The jury was instructed that the opening statements were not evidence. In addition, Monturo's testimony was not harmful to Pope's theory of the case, which was that he did not fire any shots.

Monturo tested the bullets and bullet fragments that were recovered from the victims and from the scene. He indicated that they had been fired from either a .38 or .357 weapon. In contrast, the weapon that Pope claimed to have had at the time of the shootings, and later turned into police, was a High Standard .22 long rifle nine-shot revolver. None of the bullets or fragments matched this gun. Amended Transcript of Proceedings, Volume IV., p. 660.

{¶ 65} The next alleged improper remark also occurred during opening statements. According to Pope, the prosecutor "twisted" the jury's duty by telling the jury that its job was to conclude that the crime happened in the way in which the prosecutor stated. However, Pope has taken the prosecutor's comment out of context.

{¶ 66} When discussing the charge pertaining to Gerald Brown's murder, the prosecutor stated that:

> The reason I wanted to underscore that with the written word is this: This is a legal term of art but it's your job factually to conclude that this happened. Did Kenneth Pope Junior cause the death of Gerald Lamont Brown while committing felonious assault with Terrence Snowden? Amended Transcript of Proceedings, Volume II, p. 262.

{¶ 67} Although the prosecutor's statement could have been more artfully phrased, the final sentence clearly indicates that the jury is responsible for deciding the issue of whether Pope's actions contributed to Brown's death.

{¶ 68} The next issue concerns an instance where the State argued with defense counsel in front of the jury. However the State was not the only transgressor in this regard. *See* Volume II, p. 211 (where defense counsel argues with the State in front of the jury).

**{¶ 69}** When the State objected in front of the jury in an argumentative fashion, the trial court called both counsel to the bench and said: "You're not to do that in front of the jury. And if either one of you does, I'll admonish you in front of the jury. Now cut that crap out." Volume III, p. 553. When defense counsel asked if the court was referring to both counsel, the court said "Yes." *Id.* at 554. After reviewing the transcript, we note that the demeanor of both sides in this case was not a model of civility. However, it did not prejudicially affect Pope's substantial rights.

**{¶ 70}** Finally, with respect to the prosecutor's cross-examination, we observe that in most instances, Pope failed to object. Furthermore, in a similar situation where the prosecutor had explicitly stated on cross-examination that the defendant was lying, we observed that " '[p]rosecutors have wide latitude in cross-examining witnesses, subject to the trial court's discretion.' " *State v. Williams*, 2d Dist. Montgomery No. 24548, 2012-Ohio-4179, ¶ 53, quoting *State v. Brown*, 2d Dist. Montgomery No. 24541, 2012-Ohio-1848, ¶ 22. (Other citation omitted.) In this regard, we stressed that:

> The statements made by the prosecutor during his cross-examination of Maxwell were not in the context of telling the jury who and what they should believe, but they were in the context of confronting Maxwell himself with his admitted lies. Here, the prosecutor was questioning Maxwell concerning his truthfulness, asking, "[a]nd every time another piece of evidence comes out to prove your lies, you make up another lie. Isn't that true? Isn't that how you work?" Maxwell then replied, "No." It was up to the jury to decide who to believe. The prosecutor's question sought information relevant to the witness's credibility.

*See State v. D'Ambrosio*, 67 Ohio St.3d 185, 193, 1993-Ohio-170, 616 N.E.2d 909; *State v. Slagle*, 65 Ohio St.3d 597, 606, 605 N.E.2d 916 (1992) (during cross-examination, the prosecutor was merely aggressively questioning the witness about his honesty and his intent).

Prior to the challenged exchange between the prosecutor and Maxwell, Maxwell had already acknowledged that, on multiple occasions, he lied to the police both orally and in writing. * * * In fact, Maxwell acknowledged that he had told the police six different stories about what had happened on the night Frazier was killed, and that the version he told the jury on direct examination was story number seven. * * * Maxwell also changed his story several more times throughout his cross-examination. * * * Therefore, the prosecutor was making a fair and accurate comment on the evidence already in the record. The prosecutor's comment was directly tied to, and supported by, the evidence. And, to the extent that the prosecutor's questioning may have been overly zealous or improper, it certainly did not rise to the level of creating such a defect in the proceedings. *Id*. at ¶ 54-55.

{¶ 71} The same observations can be made in the case before us. Prior to trial, Pope gave the police two different accounts of his actions on the day of the murders. He then changed his story on the stand to claim that he was in a different part of the house when the shooting began. Pope also lied about other things while on the witness stand. For example, Pope claimed that he had been in class before he arrived at the house that morning, when the evidence indicated that he was enrolled in evening classes at the time. Again, the prosecutor's

questioning may have been overly zealous at times and somewhat disrespectful, but it did not so infect Pope's trial with unfairness that the conviction violated his right to due process.  *Jeffery*, 2013-Ohio-504, 986 N.E.2d 1093, at ¶ 15.

## C.   Fifth Amendment Right

**{¶ 72}**   Pope's final contention in support of cumulative error is that he did not expressly waive his Fifth Amendment right against self-incrimination at the trial.   However, the Supreme Court of Ohio has stated in this context that:

> Generally, the defendant's right to testify is regarded both as a fundamental and a personal right that is waivable only by an accused.   But in Ohio, courts of appeals have held that a trial judge is not required to conduct an inquiry with the defendant about the decision whether to testify.  *See, e.g.*, *State v. Oliver* (1995), 101 Ohio App.3d 587, 656 N.E.2d 348.   In fact, most courts have ruled that neither the United States Constitution nor applicable rules require the trial judge to ask the defendant about the decision not to testify.  *See, e.g., Artuz*, 124 F.3d at 78; *State v. Walen* (Minn.1997), 563 N.W.2d 742 * * * .   We agree and hold that a trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense.  (Citations omitted.)  (Emphasis sic.)  *State v. Bey,* 85 Ohio St.3d 487, 499, 709 N.E.2d 484 (1999).

**{¶ 73}**   Based on this authority, the trial court did not need to obtain an express waiver before allowing Pope to testify in his defense.

**{¶ 74}**   In light of the preceding discussion, Pope's due process rights were not violated

on the basis of cumulative errors that were committed throughout the trial. Accordingly, the Fourth Assignment of Error is overruled.

## VI. Conclusion

{¶ 75} Pope's First, Second, and Fourth Assignments of Error having been overruled, and his Third Assignment of Error having been sustained, the judgment of the trial court is Affirmed in part and Reversed in part, and this matter is Remanded to the trial court for the sole purpose of giving the trial court the opportunity to make the requisite findings for imposing consecutive sentences under R.C. 2929.14(C).

. . . . . . . . . . . . .

DONOVAN and HALL, JJ., concur.

Copies mailed to:

Mathias H. Heck
Carley J. Ingram
Elizabeth C. Scott
Hon. Barbara P. Gorman