[Cite as *State v. Snowden*, 2014-Ohio-2299.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                      :

     Plaintiff-Appellee                     :          C.A. CASE NO.    25758

v.                                                 :          T.C. NO.    09 CR 2683/1

TERRENCE SNOWDEN                                   :          (Criminal appeal from
                                                              Common Pleas Court)
     Defendant-Appellant                    :

                                                   :

. . . . . . . . . .

**O P I N I O N**

Rendered on the  ____30th____  day of  ____May____, 2014.

. . . . . . . . . .

CARLEY J. INGRAM, Atty. Reg. No. 0020084, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

CHRISTOPHER W. THOMPSON, Atty. Reg. No. 0055379, 130 W. Second Street, Suite 1444, Dayton, Ohio 45402
     Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

     **{¶ 1}**   This matter is before the Court on the Notice of Appeal of Terrence

Snowden,

filed May 14, 2013. Following a trial by jury, Snowden was found guilty, on April 18, 2013, of four counts of murder (proximate result), in violation of R.C. 2903.02(B), each with a three year firearm specification; one count of having weapons while under disability (prior offense of violence), in violation of R.C. 2923.13(A)(2), and one count of having weapons while under disability (prior drug offense), in violation of R.C. 2923.13(A)(3). Snowden was sentenced to an aggregate term of 36 years to life in prison. The issues Snowden raises herein are limited to the exclusion of a potential juror for cause, on the State's motion, as well as the imposition of consecutive sentences in the absence of findings mandated by R.C. 2929.14(C).

{¶ 2}    We initially note that on August 12, 2013, defense counsel filed a "Motion for Modification of the Record Pursuant to App.R.9(E)," and that on January 2, 2014, an "Agreed Order Modifying the Record, App.R. 9(E)" was filed. The Agreed Order identifies the statements in the transcript made by "Mr. G* * *," the potential juror excused for cause, who was initially identified as "UNIDENTIFIED SPEAKER" in the transcript. The Agreed Order provides that "Mr. G* * * will be identified in the transcript for the purpose of this appeal as 'JUROR 11.'"

{¶ 3}    The record reflects that the following exchange occurred in the course of voir dire:

> THE COURT: So let me ask the question. All right? Sure, you understand that the law - - if the - - Judge Gorman gives you a law relating to aiding and abetting - - and that is if you are not the principal, the person who, for instance, is the one with the weapon, you may be - - if the facts fit the law,

you may be responsible for that act. Can you follow that law if Judge Gorman gives you that instruction?

MR. FRANCESCHELLI: * * *

The bottom line being if there is an instruction of aiding and abetting, can you follow that instruction or could you not follow it because you disagree with it, like you had suggested?

THE COURT: Go ahead.

JUROR 11: I would follow it. But I would - -

MR. FRANCESCHELLI: Not like it?

JUROR 11: I would not like it. You know, it would be hard.

MR. FRANCESCHELLI: Okay.

JUROR 11: Yeah. And it would - - I guess I'm OCD and I would question and question and go back and forth and - -

MR. FRANCESCHELLI: Uh-huh. That's what you should do.

JUROR 11: It would be rough.

MR. FRANCESCHELLI: Okay.

JUROR 11: But I would probably follow the law, yes.

* * *

{¶ 4} Defense counsel later advised the venire that there would be testimony about "a drug house and the use of drugs," and he asked the potential jurors if any of them knew anyone who "has used crack cocaine, have you ever seen them when they are high on crack cocaine?" The prosecutor objected to the question and argued as follows at sidebar:

The basis of my objection has to do with going into potential planting of a seed whatever defense's theories are in the case. For example, trying to plant the seed that a witness or witnesses are on crack cocaine. It may be a drug house and there may be drugs sold to folks that come to the house and want to buy it, but now we're getting into whether or not the credibility of witnesses is at stake as it relates to smoking or doing crack cocaine, which I'm not sure you're even going to hear any evidence of that in this particular case. So my understanding is, is that you can't try your case in jury selection.

{¶ 5} The trial court concluded as follows: "* * * I'm going to allow you to ask that question because I think - - I think it's fair to ask people if they have preconceived ideas about people who use drugs, if - - whether it affects their credibility or not. So I'm going to allow you to ask this, but let's keep on the path, okay?"

{¶ 6} Subsequently, the following exchange occurred:

* * *

MR. SKELTON: There's going to be evidence in this case, we've already talked about it, that where the shootings in this case happened was a drug house. And I don't think it's in dispute that the primary drug at the house was crack cocaine. There's also going to be evidence in this case that, well, I think most of the witnesses you're going to hear from, were all in

that house, and I'm talking about the lay witnesses, not the police. * * *

Does that fact, where this happened, the - - the shooting in this case, does that fact that it was in a crack house cause anybody concern one way or the other - -one way being that - - in fairness to the State, that, you know, because it was a crack house that, you know, the credibility of witnesses would be suspect, or vice-versa, because it's - - it was a crack house and Mr. Snowden was in the crack house that, you know, he must be a low-down guilty person, either way, does - -do any of you have any leanings one way or the other on that?

Sir?

JUROR 11: I might lean toward that, but just my experience with a brother, grandma, nephew, addicts go to - -

MR. FRANCESCHELLI: Your Honor, I'm going to object. Can we do this at sidebar?

THE COURT: Yes, please. Sir if you'll come on up to sidebar.

(At sidebar)

* * *

THE COURT: And your answer, please.

JUROR 11: My brother was for a long time an addict, who's off of it. Lived with us, and now my brother-in-law and nephew are into that. And we go to a small church that - - it's more for addicts. It's my pastor was an

ex-felon, and so that's the kind of people that is drawn to us, you know. And in my experience - -

MR. SKELTON: Drawn to you - - drawn to you at the church?

JUROR 11: At the church, yeah, yeah. Ex-addicts, ex-felons and that type. But my experience with my brother and brother-in-law and nephew, it seems like all users lie, and I know they would be on a witness stand, but - -

MR. FRANCESCHELLI: Who's going to be on the witness stand?

JUROR 11: If there's anybody from in the crack house, so-called, that might - - my first thought would be, are they telling the truth?

MR. FRANCESCHELLI: Why?

JUROR 11: Because of my experience. Because that's all I've seen with my experience, that it's - - they're users, and not just users of drugs, but they try to use people is - -

THE COURT: Is it your experience that either addicts or recovering addicts don't tell the truth about anything or is it, I mean anything in particular that they don't tell the truth about?

JUROR 11: I'm going to say about everything. The recovering addicts - -

THE COURT: Uh-huh.

JUROR 11: - - when they seem like they're doing well - -

THE COURT: Uh-huh.

JUROR 11: - - no, I trust them, especially in the church, and that might be bias.

THE COURT: Uh-huh.

JUROR 11: But in the church, no I trust them.  But when you see a pattern of them not coming to church - - because I know people from the church - - not coming to church and this, I start questioning, are they telling me the truth?

MR.  FRANCESCHELLI:  What  about  sellers?    Do

you have an opinion    about sellers?

JUROR 11: I do not know any sellers.

* * *

THE COURT: You can have a seat sir, okay?

JUROR 11: May I say something now or do I - -

MR. SKELTON: Yes.

THE COURT: Go ahead, if you want to establish - -

JUROR 11: About a different topic.

THE COURT: Sure.

JUROR 11: About me.  Being honest, knowing myself and the way I question myself, I check the doors and windows two to three times a night. At my work, surveying - - like this past Friday I laid a waterline and I'm thinking, I better check these plans again, I better do this, you know, and I checked it and once I got back to the office what's - - what is being asked of here (sic) and what's put on - - I mean the Defendant's put on the line here for - - I'm putting that right but - -

MR. FRANCESCHELLI: I hear you.

MR. SKELTON: Yeah, and I know what you're saying.

JUROR 11: You know what I'm saying?  I don't know if I was - - question myself so much if I could come - - you know what I mean, I would just keep going back and forth and making sure - -

MR. SKELTON: I understand.

THE COURT: And you indicated - - I believe previously you said something like, I'm OCD and I  - - does that play into your concerns is that you - -

JUROR 11: That's what my concern would be is - - now, I would go and do the best that I could but I - - knowing myself - -

MR. SKELTON: That's all we can do.

JUROR 11:    - - I would go back and forth and be like, did I hear that right, am I thinking this right, should I do this, on - - because of what's at stake.

THE COURT: Do you feel that - - based upon all of that, do you feel that you would have difficulty or couldn't reach a decision - - not that you wouldn't be fair - - but that you would - -

JUROR 11: There's a poss - -

THE COURT: All right.  Well - - I'm trying to think of the way I want to ask this.   Do you have another question on this particular issue?

MR. FRANCESCHELLI: No. But the follow-up on where you're

going.   I know where you're going, but not - -

THE COURT: Well, I mean you've raised the issue of whether you can reach a verdict, and the jurors will be required to reach a verdict, if they can do so.   And if you feel that you cannot reach a verdict, that's what I'd like to know.

JUROR 11: Beyond - - in a civil case, probably, but what's at stake, you know, beyond a reasonable doubt - -

THE COURT: Uh huh.

JUROR 11:   - - that - - I would question myself, yes, I don't know if - -

MR. SKELTON: Well, we all questions (sic) ourselves, but the question is, can you listen to the evidence that's presented, read the law that the judge gives you, pay attention to what Mr. Franceschelli says, pay attention to what I say, go - -

THE COURT: And the witnesses.

MR. SKELTON: And the witnesses - - go back down to deliberate, you know, and try and make a decision.   I mean sometimes decisions can't be made.   We understand that.   But can you do that?

JUROR 11: Try, yes.

MR. SKELTON: That's all we can ask.

THE COURT: Any other questions of this - -

MR. FRANCESCHELLI: Oh yeah, I do.   I have - - he's trying to be -

- you know, he's being upfront with us.   And I guess what I   - - if I'm wrong you tell me - - but what I hear you saying, given the nature of this kind of a case being criminal and it's a murder case, that kind of weighs on your thought process a little bit, it's not a civil case, is what I think you meant. And judging from your response that you gave about knowledge of people who are, I think you used the word addicts or use crack - -

JUROR 11: Yeah.

MR. FRANCESCHELLI: You're kind of looking at Mr. Skelton when - -        JUROR 11: I think that's what he used, and that's why I - -

MR. FRANCESCHELLI: Right, he did.

JUROR 11:   - - he used it.

MR. FRANCESCHELLI:     That's why I asked. Do I understand you that you would not be fair and impartial in this particular case in and of itself because of those topics?   That's what we need to know.

JUROR 11: If a witness from that house was on the witness stand, my first thought would be I don't trust them.  But when I got back to the jury room, knowing my   - -me questioning myself, beyond a reasonable doubt, I don't know if I could come to a - -

MR. FRANCESCHELLI: Okay.

JUROR 11:   - - decision - -

MR. FRANCESCHELLI:   - - you couldn't be a fair and impartial juror in this kind of setting and case?

JUROR 11: Probably not.

MR. FRANCESCHELLI: Okay. That's what I thought you were trying to say.

THE COURT: Well, I thought he said he couldn't reach a decision, so Mr. Skelton?

MR. SKELTON: We can go back and forth on rehabilitating, Judge, but the witness - - or the juror has indicated - - and I'll ask you, you said - - I mean we all have a preconceived idea about whether we believe somebody or not, or because of this or because of that, right, if they have something in their background and they do something. But you've told us, I think, that you'll be able - - you'll do your best to listen to the evidence as it comes from this witness stand, go back to the jury room and make a decision. Is that fair?

JUROR 11: Yes, I think I might have taken you wrong. Impartial, yes. Weighing the - -

THE COURT: Well - -

JUROR 11: - - evi - -

THE COURT: Yeah, I'm confused - -

JUROR 11: - - by that.

MR. FRANCESCHELLI: I'm sorry.

JUROR 11: I'm sorry too.

THE COURT: No, no you don't have to be sorry. I just want to make sure we're all clear about what you're saying. You don't - - you don't

need to be sorry.

JUROR 11: All right. A witness from the house, I would first question them, but I would listen to them and take in every account. So being an impartial juror, I think I'd be okay. That's - - I get - - the question - -I guess the biggest thing is questioning myself back here, just, I don't - -

THE COURT: All right. So - -

JUROR 11: - - know if I could come to a decision on what's at stake without so much questioning that it would just - -

MR. FRANCESCHELLI: Meaning you couldn't vote you mean?

JUROR 11: Possibly.

MR. AMOS: No matter what the evidence was?

MR. FRANCESCHELLI: Because if you can't vote - - well, I'm not going to say - -

THE COURT: Well, that's a different - - that's a different issue if you feel that you couldn't vote or make a decision - -

JUROR 11: Correct.

THE COURT: - - on your own. Do you feel that you could do that?

JUROR 11: At this time I'm not sure.

MR. FRANCESCHELLI: Fair enough.

JUROR 11: After the evidence, I mean, and then you ask me that question - -

THE COURT: Sure.

JUROR 11: - - that would be something, but at this time I'm not sure.

THE COURT: Okay. Anything else to ask, Mr. Skelton? Why don't you go ahead and have a seat, sir, and we'll - -

JUROR 11: Thank you.

{¶ 7}   The following exchange occurred at side bar after Juror 11 returned to his seat:

MR. FRANCESCHELLI: This prospective juror didn't, when he was asked on Court questioning and from myself as it related to the topic of the issue of it being a homicide in a crack house, never went to any explanation of his thoughts or feelings - -

THE COURT: Uh-huh.

MR. FRANCESCHLLI: - - about witnesses as it related to taking drugs I guess. And I was very concerned when Mr. Skelton went into questioning - -which dovetailed, as I argued earlier, on the issue of credibility, and then the next question was basically, in my opinion, was that these witnesses - - and what are their thoughts about the witnesses if they're, you know, being on crack. It's kind of interesting that this prospective juror as best he could in layman's terms try (sic) to explain his opinion.

What he's told us now is he doesn't think he can even render a decision in this case, and as the basis of that he started indicating on the record and to the Court and counsel using words like he couldn't do it

because he knows people in his church that take crack, were on crack, he knows they lie, and he started talking in those terms, I believe, assuming from Mr. Skelton's questioning, dovetailing credibility and witnesses being on crack cocaine that he's come to that conclusion, really unfortunately, in his mind, because I don't believe that's how the evidence is even going to turn up.   I'm not done.

THE COURT: I understand.

MR. FRANCESCHELLI: So having done that, now we have this prospective juror who unfortunately is even questioning his ability to sit as a juror in this case and actually go back and deliberate.   And while at times he says he may not be impartial, at other times he says he could be impartial. What he always is saying now is, in light of Mr. Skelton's questioning is, is that he doesn't even think he could render a decision, which is even worse.

THE COURT: A couple of things.   Because he made this clear a long time ago.   I recall him specifically saying, I'm OCD, I'm going - - you know, I'm going to question whether I can make this decision, and he said that a long time ago.   It may even have been when I was asking him questions.   So I'd rather deal with any challenge for cause with him for chambers so we're not holding the jurors up any longer, all right ? * * *

{¶ 8}    Following voir dire, the following exchange occurred in chambers:

THE COURT: * * *

First of all, challenges for cause from the State.

MR. FRANCESCHELLI: Juror number 11, Mr. G* * *   - - G* * *?

THE COURT: So that would be for the reasons you stated on the record in the courtroom?

MR. FRANCESCHELLI: Yes.   And that in addition he had issues with the aiding and abetting instruction, or conversation let's say, on that topic, put it that way as paraphrasing it.   I can elaborate if you'd like.

THE COURT: He gave an indication he had difficul - - he may have difficulty understanding as well as following the instruction.

MR. FRANCESCHELLI: Right.   And deliberating.

THE COURT: Well, I mean in addition to the other things that - -

MR.   FRANCESCHELLI: Right.

THE COURT:   - - he has said.

Mr. Skelton?

MR. SKELTON: I think he was being honest, Judge.   I don't think it's cause.   I mean a lot of people have problems - -

* * *

MR. SKELTON: A lot of people say that they have - - they're not sure they can make a decision and this guy's - - I don't think it rises to any of the statutory levels as cause.

* * *

MR. FRANCESCHELLI: If I may, § ORC 2313.16, and it's a memo that Judge Langer had circulated some time ago that pointed out the reasons

for excusing a citizen for jury service, and one of them is the interest of the public will be materially be (sic) injured by the juror's attendance.  And I would submit because of his honesty and candor in announcing to the court and on the record that he could not deliberate, given the issues in this particular criminal case, that that's exactly what's going to be happening, the public is going to be injured, and if he can't deliberate and render a decision in this case I don't know why we'd send him back there.

In addition, the Court - - you'll have to help me out a little bit here, Your Honor, if you want - - but in addition, under 2313.16 the topic of when a prospective juror has a mental or physical condition that renders him or her incapable of performing jury service, you caught on, and I missed, to be honest with you, about the - -

THE COURT: He specifically said - - I believe it was when I was asking some questions - - that he has OCD and that he has difficulty - - well, with a lot of different things.  I don't want to be specific because I don't recall the exact things he said.  I don't want to put words in his mouth.  But when I asked him about that again at sidebar when - - in Mr. Skelton's portion of the voir dire again.  Okay.

* * * I don't think * * * 2313.16 qualifies, specifically the prospective juror having a mental or physical condition that causes a prospective juror to be incapable of performing jury service.  That requires that there must be some documentation from a licensed physician provided to the Court.  And

so for that reason - - that argument, the objection is overruled.

You know, I'm really torn on the other issues because he said so many different things that caused me to be very concerned. Not one single one would, I think add up to cause, but the totality of all of them I think under criminal rule 24 leads me to the conclusion that he's otherwise unsuitable for cause to serve as a juror. And I don't say that lightly, because I've been thinking about this quite a bit. He said so many things that caused me to be concerned that A, he could not render a decision, and B, that he might not foll - - that he may not be able to follow the law, so for those reasons I am going to excuse him for cause with the Defendant's objection noted.

MR. SKELTON: And just so that Your Honor, considering the gravity of this case - -

THE COURT: Yes. * * *

MR. SKELTON: - - I would like to make the - -

THE COURT: Sure. Go ahead.

MR. SKELTON: - - the record. If the Court is suggesting that there were so many of those things that caused the court to reach this conclusion, I would just inquire - -

THE COURT: Sure.

MR. SKELTON: - - what would be those many things.

THE COURT: Sure. He specifically said - - repeatedly said because of the way he is, and I think those are the words that he used, that he would

continually doubt, would continually be unable to render a decision, and then he would remark, well, I'll try, but then he repeatedly went back to, but I don't know if I can do that, I don't know if I can make a decision, I'm going to continually question myself - - and he kept saying question myself, not question the evidence. He did indicate several times that he is OCD, and again, that, I don't think, in and of itself is sufficient, but he continually said, I'm going to continually question myself.

He did indicate several times that he wasn't certain he could follow the law. Again, he didn't say he couldn't. He continually questioned whether he could. He cont - - he said - - I mean - - and he was questioned quite a bit, he felt that people who were drug addicts were - - -would not be telling the truth and that he couldn't give any weight to their evidence. He repeatedly said that. Those are just some of them.

So your objection is noted on the record though, all right?

* * *

{¶ 9} Snowden's first assignment of error is as follows:

"THE TRIAL COURT ABUSED ITS DISCRETION BY EXCUSING A JUROR FOR CAUSE, OVER AN OBJECTION, BASED, IN PART, UPON A DISABILITY AND ITS SIDE EFFECTS WITHOUT MAKING A DETERMINATION IF A REASONABLE ACCOMMODATION EXISTED."

{¶ 10} Snowden asserts that "[i]n the end [Juror 11] agreed to follow the law" on aiding and abetting. Snowden asserts that Juror 11 stated that "he trusts addicts that were in

church," and that in "other words, he gives addicts the benefit of the doubt, until their conduct makes him question it." Snowden argues as follows:

In defense of Juror 11, "because of what's at stake" his attention to detail could be viewed as a desirable quality. I personally, would want my waterline laid proeprly. He wants to get it right and that is exactly what we want the jurors to do, get it right.

Whether or not he "[heard] that right" or "thinking this right" (sic) could be discussed in the deliberative process. Juror 11 strives for perfection, that does not make him unfit to serve.

If his fastidiousness is a result of Obsessive Compulsive Disorder then he has a mental impairment and a disability.

\* \* \*

In the case before the Court, the erroneous exclusion of prospective Juror 11 from the jury, a result of his disability, violated his right not to be denied the opportunity for jury service, an important attribute of citizenship, on the basis of his disability. Snowden has standing, vicariously, to vindicate that right. \* \* \*

In deciding a challenge for cause to a prospective juror on the basis of a physical impairment, the court must determine, in light of the specific evidence to be presented, whether any reasonable and effective accommodation can be made to enable the juror to serve. In making that determination, the court must balance the public interest in equal access to

jury service against the right of the accused to a fair trial, the latter being the predominant concern of the court. *State v. Speer*, 124 Ohio St.3d 564, 2010-Ohio-649 [, 925 N.E.2d 584.]

Snowden argues that the "record is devoid of any inquiries into how [Juror 11's] OCD could be reasonably accommodated or an explanation of the deliberative process." Finally, he asserts that the "four concerns of the court individually do not amount to a dismissal of the juror for cause. Any dismissal based in part upon a disability and it[s] side effects, without first exploring reasonable accommodations, is an abuse of discretion."

{¶ 11} The State responds that "[p]rospective Juror 11 was unsuitable for jury service because he informed the court and counsel that his obsessive thinking and chronic indecision could prevent him from deciding the case and signing a verdict." According to the State "[w]hether or not he had been diagnosed by a physician as suffering from obsessive-compulsive disorder, the pathological doubt that he described as affecting his everyday life is a hallmark of that condition." The State asserts that Juror 11 "is similar to prospective jurors in capital cases who are excused for cause because they cannot say with confidence that they could put aside their beliefs and sign a verdict recommending the death penalty." The State asserts that neither Juror 11's "disinclination to trust the word of a drug user nor his attitude toward the relative culpability of an accomplice might, on its own, disqualify him from jury service since he agreed that he'd 'have to go along with' the law as instructed and he never suggested that he would absolutely and irrevocably reject the testimony of the kind of witnesses upon which the State's case depended." The State argues that Juror11's "disagreement with the law and an unwillingness to believe a witness who

used drugs would make it that much more difficult for him to meet his obligations as a juror." Finally, the State asserts that *Speer* "applies to physical, not mental disabilities," and that Juror 11's "problem was psychological, not physical, and it was not amendable to 'reasonable accommodation.'"

{¶ 12}  "The determination whether a prospective juror should be disqualified for cause is a discretionary function of the trial court, and the trial court's determination will not be reversed on appeal unless there has been an abuse of discretion.  *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301, syllabus."  *Speer*, Lanzinger, J. dissenting, ¶ 99.  "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeons, Inc.*, 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985). A decision is unreasonable if there is no sound reasoning process that would support that decision. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 553 N.E.2d 597 (1990);  *Feldmiller v. Feldmiller,* 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 7.

{¶ 13}  As noted in *Speer*, "R.C. 2945.25 and Crim.R. 24 list the particular causes for which a prospective juror may be challenged in a criminal case."  *Id*., ¶ 16.  Crim.R. 24(C) provides that "[a] person called as a juror may be challenged for the following causes: * * *  (14) That the juror is otherwise unsuitable for any other cause to serve as a juror." R.C. 2945.25(O) contains a nearly identical "catch-all" provision.

{¶ 14}  Having thoroughly reviewed the record herein, we cannot conclude that the trial court abused its discretion in excusing Juror 11 for cause.  The court indicated that Juror 11 "said so many different things" that caused the court concern, and that based upon

their totality, Juror 11 was unsuitable to serve as a juror, pursuant to Crim.R. 24. It was most significant to the court that Juror 11 repeatedly expressed uncertainty in his ability to reach a decision; he described a thought process characterized by vacillation, hesitation and self-doubt. We note that Juror 11 brought this "topic" to the court's attention on his own accord and not in response to questioning. It was also significant to the court that Juror 11 indicated that he "would not like" to follow an instruction on aiding and abetting, that it would "be hard" to do so, and that he "would *probably* follow the law." Finally, the court expressed concern that Juror 11 may not accord any weight to the testimony of the State's witnesses, who were present in the crack house when the shooting occurred, based upon his assertion that "it seems like all users lie." Juror 11 acknowledged that his distinction between recovering addicts who attend church and addicts who do not "might be bias."

{¶ 15} We cannot agree with Snowden that Juror 11 was improperly excluded as "a result of his disability." The court specifically stated that the State's objection was overruled on the basis of "a mental or physical condition that causes the prospective juror to be incapable of performing jury service." R.C. 2313.14(A)(4)(formerly cited as R.C. 2313.16). Finally, we agree with the State that *Speer* applies to physical, not mental disabilities. Paragraph one of the syllabus provides: "In deciding a challenge for cause to a prospective juror on the basis of a physical impairment, the court must determine, in light of the specific evidence to be presented, whether any reasonable and effective accommodation can be made to enable the juror to serve." Juror 11 did not have a physical impairment, *Speer* does not apply, and the trial court was not required to determine if a reasonable accommodation existed for Snowden. Since an abuse of discretion is not demonstrated,

Snowden's first assigned error is overruled.

{¶ 16} Snowden's second assigned error is as follows:

"THE TRIAL COURT ERRED IN SENTENCING APPELLANT TO CONSECUTIVE SENTENCES."

{¶ 17} Snowden asserts that at "the sentencing on April 10, 2013, the court failed to make any findings pursuant to R.C. 2929.14. Without such findings, the trial court erred in sentencing Mr. Snowden to consecutive sentences." The State concedes error at sentencing and asserts that the "proper remedy is to remand the case to give the trial court the opportunity to explicitly place its findings on the record."

{¶ 18} As this Court noted in *State v. Pope*, 2d Dist. Montgomery No 25306, 2013-Ohio-4821, ¶ 45:

"Effective September 30, 2011, Ohio law requires judicial fact-finding for consecutive sentences." *State v. Forney*, 2d Dist. Champaign No. 2012-CA-37, 2013-Ohio-3034, ¶ 8, citing *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 46 (2d. Dist.) "Specifically, a trial court must find 'that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public[.]'" *Id*., quoting R.C. 2929.14(C)(4). In addition, the court must also find one of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed

pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. R.C. 2929.14(C).

{¶ 19} A review of the transcript of the sentencing hearing reflects that the trial court failed to make the findings required by R.C. 2929.14(C). Accordingly, Snowden's second assigned error is sustained. We agree with the State that the proper remedy is to remand the matter for the trial court to explicitly place the requisite findings on the record.

{¶ 20} The judgment of the trial court is affirmed in part and reversed in part, and the matter is remanded to the trial court to consider the findings required for consecutive sentences by R.C. 2929.14(C), and to re-sentence Snowden in accordance with its findings.

. . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Carley J. Ingram
Christopher W. Thompson

Hon. Barbara P. Gorman